AMERICA'S COMMUNITY
BANKERS, Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE COR-
PORATION and Financing Corporation,
an agency of the United States of Amer-
ica, Defendants.

Civil Action No. 97–00416–LFO.

United States District Court,
District of Columbia.

Nov. 25, 1998.

H. Stephen Harris, Jr., Phillip R. Stein,
Alston & Bird, Atlanta, GA, Henry Joseph
Birnkrant, Alston & Bird, Washington, DC,
for plaintiff.

Thomas Holzman, Federal Deposit Ins.
Corp., Legal Div., Washington, DC, for de-
fendant.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiff, America's Community Bankers, an association of saving associations, some of whom are insured by the Savings Association Insurance Fund ("SAIF"), brought this action against the Federal Deposit Insurance Corporation ("FDIC"). The plaintiff invokes the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*, seeking injunctive relief on the grounds that the FDIC exceeded its authority and acted unlawfully when it failed to refund certain amounts to plaintiff's members. As an alternative to injunctive relief, the plaintiff requests a declaratory judgment that the FDIC acted unlawfully. The monies at issue are the portion of the fourth quarter 1996 installment of the FDIC's semi-annual assessment that the FDIC collected for the benefit of the Financing Corporation ("FICO"), *see* 12 U.S.C. § 1441 (1994 & Supp. II). FICO is a government corporation created to issue and service bonds, the proceeds of which were applied by FICO to help salvage the savings and loan industry.

### I.

The ultimate issue here, if it can be discovered through the thicket of acronyms in the various pleadings, is whether FDIC had a duty to refund money collected from SAIF members and paid over to FICO on September 30, 1996.

### A.

Key aspects of the statutory scheme frame the issues:

1. In 1987 Congress created FICO to provide funds for the recovery of the savings and loan industry, and authorized it to capitalize itself by issuing bonds. To service the bonds Congress authorized FICO to assess the participants in the savings and loan industry. *See* Competition Equality Banking Act of 1987, Pub.L. No. 100–86, 101 Stat. 552.

2. In 1989 Congress created an insurance fund for savings associations, the SAIF, modeled on the FDIC's Bank Insurance Fund, which insures bank deposits. It tasked the FDIC to assess SAIF members for the benefit of SAIF in amounts sufficient "to achieve and maintain a 'designated reserve ratio'" (DRR) of 1.25% of estimated deposits within 15 years. 12 U.S.C. § 1817(b)(2)(A)(i)(I) and (iv)(I) (1994); *see also* 12 U.S.C. § 1441(f)(2).

3. Title 12 U.S.C. § 1817(b)(2)(A)(ii)(IV) provides further that in maintaining the reserve ratio the FDIC board should consider SAIF's expected operating expenses, case resolution expenditures and insurance, the effect of assessments on members' earnings and capitol, and *any other factors that the Board of Directors may deem appropriate.*

4. Title 12 U.S.C. § 1441(f)(2)(1994) authorized FICO, with the approval of FDIC, to make assessments against SAIF members for collection by FDIC with the proviso that the assessment for FICO and SAIF combined "shall not exceed the amount authorized to be assessed against [SAIF] members pursuant to section 1817" and that "FICO shall have the first priority."

5. In 1991 Congress introduced a risk-based assessment system, effective in 1994, which gave FDIC discretion to set assessment levels sufficient to maintain the prescribed DRR.

6. On September 30, 1996, the President signed into law the Deposit Insurance Funds Act of 1996 (DIFA). It became effective the next day, October 1, 1996. DIFA provided, *inter alia,* for the capitalization of SAIF by a single assessment sufficient for SAIF to maintain the required DRR for the entire fourth quarter of 1996. *See* 12 U.S.C. § 1817(b)(2)(A)(i); *see also* Pub.L. 104–208, § 2702, 110 Stat. 3009–479–484.

Title 12 U.S.C. § 1817(b)(2)(A)(i) (1994) provided that in achieving DRR the FDIC Board "shall set semiannual assessments for insured depository institutions to maintain the reserve ratio of each deposit insurance fund at the [DRR] ...." However, the statute also directed FDIC to "set semiannual assessment for *insured depository institutions* when necessary, but *only when necessary.*" *See* 12 U.S.C. § 1817(b)(2)(A)(i) (1994 & Supp. II) (Emphasis added.) DIFA preserved the proviso that in "achieving and maintaining" the DRR of the insured depository institutions, the FDIC Board of Directors "shall" consider the deposit insurance

fund's "(I) expected operating expenses, (II) case resolution expenditures and income, (III) the effect of assessments of members' earnings and capital, and (IV) *another other factors that the Board of Directors may deem appropriate.*" (Emphasis added.)

## B.

The transactions which are the focus of this litigation evolved substantially as follows:

In a May 30, 1996 memorandum, the FICO reminded FDIC that

Section 21 of the Federal Home Loan Bank Act ... states that the

... FICO has the authority to assess insured institutions for the purpose of paying insurance, interest, and custodial costs incurred by FICO. FICO has first call on insured institution assessments subject to FICO's assessment authority.

This memorandum requests FICO's assessment for the semiannual assessment for the period July 1, 1996 through December 31, 1996.... FICO will require a total assessment for the semiannual period of $396,665,000. The semiannual assessment should be converted into the appropriate assessment rate to be billed to the insured deposit institutions. In accordance with the Memorandum of Understanding between FICO and the

FDIC, FICO's cash requirements for the *third quarter* will be $119,360,000.[1]

. . . . .

The funds for the third quarter are to be *wired* to FICO's account as soon as they are available on June 28, 1996.[2]

On or about August 31, 1996, FDIC sent invoices to each of the assessable savings institutions for collection of the *fourth quarter* 1996 assessment payment. On *September 30, 1996* the FDIC collected its fourth quarter[3] 1996 installment of the semiannual SAIF assessment and on that same day transmitted $119,360,000 to the FICO, the amount of its assessment for the fourth quarter. Later in October 1996, FDIC imposed on SAIF members the special assessment retroactive to October 1, 1996, and collectible on November 27, 1996, as authorized by DIFA § 2702.

## C.

After an October 14 notice of proposed rulemaking the FDIC Board held an open meeting to consider a Final Rule on SAIF assessment rates applicable after the attainment as of October 1 of 1.25% designated reserve ratio. *See* Transcript of Board of Directors Meeting held on December 11, 1996 ("Tr.").[4] Colloquies referred to the "transitional nature of [the] quarter in which the [SAIF] has been capitalized but [FICO] continues to have priority with respect to

1. In late 1996, FDIC and FICO entered into a Memorandum of Understanding (MOU) to describe "the protocol for the transfer of funds to FICO to make debt service payments to its bondholders." It provided that "FDIC will act as collection agent and will collect the amounts assessed on SAIF members as required by FDIC" subject to certain conditions. In particular, "all amounts collected pursuant to FICO's assessment authority, including any accrued interest, shall belong to FICO, consistent with FICO's priority assessment authority ...." FDIC acknowledged that, unless the facts or law changed, FICO owed its bondholders $396,665,-000 every six months until 2017. The MOU further recited that "[u]pon receipt of each quarterly collection of FICO assessments (or at such earlier times as may be required), the FDIC will transfer to FICO promptly all amounts assessed by FICO with the approval of the Board of Directors of the FDIC, collected by the FDIC, and necessary for FICO to meet its obligations during the quarterly period with respect to which the

collection was received." Apparently to account for the financial consequence of FICO's quarterly collections, to meet semiannual interest obligations FICO agreed to reduce periodically its assessment of SAIF members by the net amount of interest earned by FICO on funds received from FDIC quarterly held and later disbursed as a semiannual interest payment to its bondholders (FICO's "float"). FDIC agreed to hold in escrow and invest them "consistent with the investment policy of the FDIC's insurance funds in light of the intended use of the funds" solely for the benefit of FICO.

2. The third quarter began July 1, 1996.

3. The fourth quarter began October 1, 1996.

4. Attached to Defendant's Counterstatement of Material Facts Not In Dispute filed June 23, 1997.

SAIF assessments." Tr. at 3. Elsewhere the colloquy emphasized that

this is the first time we've had a situation where SAIF [the ratio] is at zero, it's entirely appropriate for the Board to consider that other factor and say since these assessments are the primary source of funding for FICO, we will consider this and allow ... that amount to be included in the rate .... [I]f the board were to take any other view ... you would have ... a situation ... where FICO could not be funded at all from SAIF assessments.... [T]he Board has the authority to read the statute in a way to avoid that potential problem.

Tr. at 12.

The Board relied on the so-called "other" clause, 12 U.S.C. § 1817(b)(2)(A)(ii)(IV), which provides that in setting assessments for insured depository institutions to achieve and maintain the designated reserve ratio the Board should consider such matters as the fund's expected operating expenses, the effect of assessments on members' earnings and capital *and* any "other factors" the Board "may deem appropriate." In response to one member's concern, a staff person responded that "[y]ou really need a very compelling argument that Congress intended that FICO wouldn't be able to serve its obligations in this situation. And ... in the absence of such a compelling argument, the way to construe 'other' is to permit our Board to consider these needs [FICO's needs] as the other factors here. And we [presumably the FDIC staff] think that it the better reading" of Congress' intent. The staff person recognized that "[i]t's possible to read 'other' in another way." Tr. 12–13. Another member of the staff explained that "the FICO draw ... is going to FICO. These ... are not going to the SAIF.... they allow the FDIC to maintain the funds at the designated ratio reserve." Tr. 13–14.

Finally, the Chairman summarized the situation as follows:

As I understand the statute prior to the enactment of the new law, FICO comes off the top .... FICO came off the top on September 30. It was paid to FICO. There's nothing in the statute that says the

FDIC is to bear those costs, or their fund is to bear these costs. Now you're giving Board a legal interpretation about whether the Board can refund the rest or not.

Tr. at 15.

A staff person confirmed the Chairman's observation as follows:

We are purely a custodian for a matter of minutes. The money comes in, goes [into] our Treasury account ...[,] a specific account for escrowed funds that don't belong to an agency .... [W]e immediately wire it to the Federal Reserve New York for FICO so it never enters on the FDIC books ....

Tr. at 20.

### D.

After notice, comment, and the considerable deliberation at the December 11, 1996 meeting, the FDIC promulgated the final rule at issue here. *See* 61 Fed.Reg. 67,687 (Dec. 24, 1996). The rule addressed primarily the fallout from Congress' decision to fully fund or capitalize SAIF at the 1.25% DRR as of October 1, 1996. This achievement of DRR arguably rendered additional assessment of most insured depository institutions for the benefit of SAIF no longer "necessary." So, the Board decided to refund to SAIF members the portion of the fourth quarter 1996 assessment which it had collected (and apparently retained) for SAIF.

The Board then turned to the issue of whether it had an obligation to refund the FICO its portion of the previously collected assessments. The Board found "ample authority for the special interim rate schedule" in the provision of subsection IV "that when setting assessments for the purpose of maintaining a fund reserve ratio at the DRR, the Board may—indeed must—consider 'any other factors' that it may deem appropriate. The FICO draw is just such a factor." *Id.* at 67,692 The factors considered included the special concerns for weaker depository institutions. According to the FDIC, the risk related assessment system required FDIC to continue to assess the weaker institutions for the benefit of SAIF, even though SAIF had achieved DRR. If, the Board noted, FDIC

assessed these weaker institutions for the benefit of SAIF, it would be necessary to move onto them the burden of the entire FICO assessment. The prospect that these weaker institutions would "bear disproportionately large share of the FICO draw" constituted "other factors." *Id.*

More important, the Board invoked the clear and long-standing intention of Congress and practice of FDIC and FICO to fund FICO so that FICO could service its outstanding bond issue, using FDIC as its collector. The Board was of the opinion that Congress could not have intended that FICO be funded intermittently just because SAIF achieved DRR from time-to-time. The Board declined to adopt "a stop-and-go funding plan for the FICO, in which the FICO access to SAIF assessments depends on the current status of the SAIF's capitalization." *Id.* Finally, the Board concluded:

> The FICO has collected its assessments for the second semiannual period of 1996, and its entitled to retain them. The SAIF-rate reduction merely serve the purpose of returning to each institution the amount that the FDIC has collected from that institution for the SAIF in excess of the amount needed to maintain the SAIF at the DRR during the final quarter of 1996, while preserving appropriate risk-based rates for all such institutions. Seen from this standpoint, the SAIF-rate reductions have no effect on the FICO assessments or on the FICO's financial condition.

*Id.*

## II.

Supplementing the rationale of the December 24, 1996 rule, the FDIC here points out that it collected and paid over to FICO its third and fourth quarter 1996 assessments before September 30, 1996, before either the effective date or the President's signing of DIFA—the statute which authorized the one time assessment to raise SAIF to the DRR. Plaintiffs conspicuously do not argue that the September 30 transactions were unlawful or inappropriate at that time. Nor do they point to any statutory authority for FDIC to refund to SAIF insured depositors FICO's share of an assessment merely because the

SAIF deposit insurance assessment met or exceeded SAIF's DRR. As the FDIC points out, if Congress had intended to authorize FDIC to refund to FICO assessees amounts due and owing at the time of their collection it would have done so. *Cf. City of Chicago v. EDF,* 511 U.S. 328, 338, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994).

In appraising the legality of the Board's refusal to refund the controverted FICO assessment, certain established canons of judicial review obtain. If the words of the statute and the intent of Congress is clear, there is no occasion to interpret the statute. *See Chevron USA, Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If however the statute is ambiguous, or does not address the issue, the agency's not unreasonable interpretation is entitled to deference. According to the Supreme Court, "If the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design," the administrator's view is to be given " 'controlling weight.' " *NationsBank of North Carolina, N.A. v. Variable Annuity Life Co.* 513 U.S. 251, 256, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) (quoting *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778).

Considered in the total context of the conflicting thrusts of the statutory scheme, the very different functions of SAIF and FICO, the chronology of enactment of DIFA, and the other complex transitional circumstances with which DIFA confronted the Board, as well as the deference owed to the statutory interpretations and considered judgments of expert administrators, the FDIC's decision not to attempt to refund its fourth quarter 1996 assessments on behalf of FICO for the servicing of FICO's bonds was neither arbitrary, capricious, nor otherwise unlawful. *See, e.g., Allentown Mack Sales and Service, Inc. v. N.L.R.B.,* 522 U.S. 359, 118 S.Ct. 818, 828, 139 L.Ed.2d 797 (1998).

## III.

Even if the Board's refusal to refund offended APA standards, in the special circumstances here, plaintiffs are entitled to neither an injunctive nor declaratory remedy.

It is a fundamental of the APA that courts reviewing agency decisions may, in appropriate cases award specific relief *other than* money damages. *See* 5 U.S.C. § 702; *City of Houston v. HUD*, 24 F.3d 1421, 1428 (D.C.Cir.1994). The term "specific relief" normally contemplates a particular "res." *See id.* at 1427–28. That money is fungible might complicate the analysis under some factual scenario. Here, however, the fungible money passed through FDIC custody on September 30, 1996, at a time and in a manner that comported with the then existing statutory scheme. Moreover, FDIC never covered the specific funds into its own accounts. It received and passed on the particular funds at issue here as a custodian. *Cf. id.* The FDIC's later reconsideration of the assessment to reflect the Act of September 30, 1996 as it affected the funds collected by FDIC and retained by it for the benefit of the SAIF does not change FDIC's responsibility for the portion of the September 30, 1996 FICO assessment which FDIC collected and passed on. Among other considerations is the critical fact that FICO formed its own assessment, tailored to its obligation to service its bonds. FDIC itself calculated the assessment for the SAIF, reducing it, as required by law, by the amount of FICO's independently formed assessment which it had forwarded to FDIC for collection.

There appears to be no authority which would allow the court to take up the plaintiff's suggestion that this court order the FDIC to fund a refund out of future assessments. Indeed, beginning January 1, 1997, and thereafter, DIFA further attenuated the FDIC's authority and responsibility with respect to the FICO assessment by making it completely separate and independent of the SAIF assessment. Thus, as of September 30, 1996, when FDIC collected and paid over the fourth-quarter assessment, it had no occasion to make any refund or offset. By the time of the next assessment, January 1, 1997, the FDIC had no authority to do so.

It is plaintiff's back-up position that if its prayer for an injunction is denied, it would be satisfied with a declaratory judgment that FDIC is obligated to refund the September 1996 FICO assessment. However, the unusual sequence of the September 30 transaction and legislation precludes such a declaration. A declaration contemplating that FDIC should refund something it does not have would be an exercise in futility. *See Tierney v. Schweiker*, 718 F.2d 449, 456 (D.C.Cir.1983). If the sort of specific relief contemplated by the APA is not available, a declaratory judgment would serve no purpose. *Cf. McKay v. Central Electric Power Co-op*, 223 F.2d 623, 625–26 (D.C.Cir.1955); *Almour v. Pace*, 193 F.2d 699, 701–02 (D.C.Cir.1951). The plaintiff does not argue that the case involves an FDIC policy that is likely to be relevant to future relations between the parties. *Cf. City of Houston*, 24 F.3d at 1428–29.

Although the amended complaint named FICO as a separate defendant, FICO apparently has never been served. The plaintiff's remarks during a motions hearing on October 30, 1997, suggest that the plaintiff was awaiting a decision of this court allowing the amended complaint to be filed. Under Rule 15(a), however, leave of the court was not required to file the amended complaint, and it was filed on May 30, 1997. *See Government of Guam v. American President Lines*, 28 F.3d 142, 150 (D.C.Cir.1994). The plaintiff is on notice that the case against FICO may be dismissed if it is not prosecuted forthwith. *See Smith–Bey v. Cripe*, 852 F.2d 592 (D.C.Cir.1988).

Accordingly, an accompanying Order will treat the FDIC's motion to dismiss as one for summary judgment and grant it. The same Order will deny plaintiff's motion for summary judgment against the FDIC, and instruct the plaintiff to show cause why its claims against FICO should not be dismissed for failure to serve and failure to prosecute.

## ORDER

For reasons stated in the accompanying Memorandum, it is this 24th day of November 1998 hereby

ORDERED: that defendant FDIC's motion to dismiss will be treated as one for summary judgment and that summary judgment in favor of the FDIC will be GRANTED; and it is further

ORDERED: that plaintiff's motion for summary judgment should be, and is hereby, DENIED; and it is further

ORDERED: that within 10 days of the entry of this order on the docket, the plaintiff shall *show cause*, if any there be, why its claims against FICO should not be dismissed for failure to serve and failure to prosecute.