200 F.3d 822 (D.C. Cir. 2000)
 America's Community Bankers, Appellant
v.
Federal Deposit Insurance Corporation, Appellee
 No. 99-5028
 United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued October 19, 1999
Decided January 18, 2000
 
 Appeal from the United States District Court for the District of Columbia(No. 97cv00416)
 H. Stephen Harris, Jr., argued the cause for appellant. With him on the briefs was Philip R. Stein.
 Thomas L. Holzman, Counsel, Federal Deposit Insurance Corporation, argued the cause for appellee. With him on the brief were Jack D. Smith, Deputy General Counsel, Ann S. Duross and Thomas A. Schulz, Assistant General Counsel, and Robert D. McGillicuddy and Barbara Sarshik, Counsel.
 Before: Sentelle, Henderson and Garland, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Sentelle.
 Sentelle, Circuit Judge:
 
 
 1
 America's Community Bankers (Bankers), a trade association of banks and savings institutions, appeals from a district court order granting summary judgment for the Federal Deposit Insurance Corporation (FDIC) in an action challenging the results of an FDIC rulemaking undertaken in response to the Deposit Insurance Funds Act of 1996 (the Act or the 1996 Act). Reviewing the agency's rulemaking under Chevron U.S.A. Inc. v. Natural ResourcesDefense Council, Inc., 467 U.S. 837 (1984), the district court upheld the FDIC's conclusions as a reasonable interpretation of the relevant statutes. Because we agree with the district court that the FDIC's interpretation of its governing statute is a reasonable one entitled to Chevron deference, we affirm the district court's decision.
 
 I. Glossary
 
 2
 Because of the numerous acronyms and terms of art employed in this opinion, we provide a brief glossary.
 
 
 3
 Bankers America's Community
 Bankers (Appellant)
APA Administrative Procedure Act
Bank Fund Bank Insurance Fund
Act or 1996 Act Deposit Insurance Funds Act of 1996
FDIC Federal Deposit Insurance Corporation (Appellee)
FICO Financing Corporation
FIRREA Financial Institutions Reform, Re covery,
 and Enforcement Act
FSLIC Federal Savings and Loan Insurance Corporation
Savings Fund Savings Association Insurance Fund
 II. Background
 
 
 4
 In 1987, in an effort to stem a crisis in the savings and loan industry, Congress established the Financing Corporation (FICO) and authorized it to issue and service bonds for the purpose of recapitalizing and stabilizing the insolvent Federal Savings and Loan Insurance Corporation (FSLIC). See Federal Savings and Loan Insurance Corporation Recapitalization Act of 1987, Pub. L. No. 100-86, 302, 101 Stat. 552, 585 (1987); see also 12 U.S.C. 1441 (1994) (current version at 12 U.S.C.A. 1441 (West Supp. 1999)); Marirose K. Lescher & Merwin A. Mace III, Financing the Bailout of the Thrift Crisis: Workings of the Financing Corporation and the Resolution Funding Corporation, 46 Bus. Law. 507, 510 (1991) (discussing the establishment of FICO). The problems of the savings and loan industry failed to abate, however, so in 1989 Congress enacted more sweeping legislation to increase the supervisory authority of the FDIC and other regulatory agencies and to "reform, recapitalize, and consolidate" the federal deposit insurance system. Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183, 183 (1989) (FIRREA); see also How a Good Idea Went Wrong: Deregulation and the Savings and Loan Crisis, 47 Admin. L. Rev. 643, 656-58 (1995) (discussing the enactment of FIRREA). To accomplish the latter, FIRREA created two insurance funds under the administrative authority of the FDIC: the Savings Association Insurance Fund (Savings Fund) and the Bank Insurance Fund (Bank Fund). See FIRREA 206 (codified at 12 U.S.C. 1815). FIRREA also abolished the FSLIC, gave the Federal Housing Finance Board administrative authority over FICO, and shifted responsibility for the interest on FICO's bonds to Savings Fund member institutions. See id. 401(a), 512.
 
 
 5
 In further legislation, Congress ordered the FDIC to promulgate by regulation a schedule to assess Savings Fund member institutions semiannually to achieve by the year 2004 a designated 1.25% reserve-to-deposits capitalization ratio, then to set semiannual assessments to maintain reserves at that level. See Federal Deposit Insurance Corporation Improvement Act of 1991, Pub. L. No. 102-242, 302(a), 105 Stat. 2236, 2345 (1991) (codified as amended at 12 U.S.C. 1817(b) (West Supp. 1999)). The FDIC's governing statute instructed the FDIC Board, in setting the Savings Fund's assessments, to consider "(I) expected operating expenses, (II) case resolution expenditures and income, (III) the effect of assessments on members' earnings and capital, and (IV) any other factors that the Board of Directors may deem appropriate." 12 U.S.C.A. 1817(b)(2)(A)(ii) (West Supp. 1999).
 
 
 6
 Another section of that statute, 12 U.S.C. 1441(f)(2), also authorized FICO, "with the approval of the Board of Directors of the [FDIC]," to assess Savings Fund members to service FICO's bonds. 12 U.S.C. 1441(f)(2) (1994) (current version at 12 U.S.C.A. 1441(f)(2) (West Supp. 1999)). The same provision mandated that the sum of amounts assessed by FICO and by the Resolution Funding Corporation under 12 U.S.C. 1441b "shall not exceed the amount authorized to be assessed against [Savings Fund] members pursuant to [12 U.S.C. 1817];" and that FICO "shall have first priority to make the assessment." Id. 1441(f)(2)(A)-(B). Finally, 12 U.S.C. 1441(f)(2)(C) required the amount of the Savings Fund assessment under 12 U.S.C. 1817 to be reduced by the amount of the FICO and Resolution Funding Corporation assessments. See id. 1441(f)(2)(C). After FIRREA abolished the FSLIC in 1989, the FDIC collected the FICO assessments on FICO's behalf along with the Savings Fund assessments. Thus the pre-1996 statutory scheme linked FICO's bond interest funding to the Savings Fund's insurance premium assessment process and gave FICO funding the higher priority.
 
 
 7
 The Bank Fund achieved capitalization in May 1995, so the FDIC lowered the assessments of member institutions. See Lisa L. Bonner, Updating FDICIA/RTC, 15 Ann. Rev. Banking L. 81, 84-87 (1996) (describing the state of the insurance funds immediately prior to passage of the 1996 Act). In comparison, the Savings Fund remained significantly undercapitalized, and Savings Fund assessments remained high, because of the diversion of a portion of Savings Fund assessments to satisfy FICO's bond interest obligation. See id. Pursuing lower insurance fund assessments, Savings Fund member institutions sought to shift their deposits to the Bank Fund, and thus threatened to destabilize the Savings Fund and FICO's ability to pay its bond interest obligation. See J. Virgil Mattingly & Keiran J. Fallon, Understanding the Issues Raised by Financial Modernization, 2 N.C. Banking Inst. 25, 62-63 (1998) (discussing the enactment of the 1996 Act). To address this problem, Congress passed the 1996 Act, which the President signed into law on September 30, 1996. See id.
 
 
 8
 The Act ordered the FDIC to impose a special assessment sufficient to raise the Savings Fund to the 1.25% designated reserve ratio for the fourth quarter of 1996 as of October 1, 1996. See 1996 Act, Pub. L. No. 104-208, 2702, 110 Stat. 3009, 3009-479 (1996). The Act also amended 12 U.S.C. 1817(b)(2)(A)(i) to require that the FDIC make Savings Fund assessments "when necessary, and only to the extent necessary" to maintain Savings Fund reserves at the designated reserve ratio. 1996 Act 2708(a), 110 Stat. 3009-497 (codified at 12 U.S.C.A. 1817(b)(2)(A)(i) (West Supp. 1999)).Finally, effective January 1, 1997, the Act authorized FICO to service its bonds by assessing all insured depository institutions, not just Savings Fund member institutions; and in a related amendment, the Act eliminated the language in 12 U.S.C. 1441(f)(2) that linked the FICO and Savings Fund assessments. See 1996 Act 2703(a), 110 Stat. 3009-485 (codified at 12 U.S.C.A. 1441(f)(2) (West Supp. 1999)).
 
 
 9
 To summarize: As of October 1, 1996, the Savings Fund was fully capitalized at the designated reserve ratio. Thus, under 12 U.S.C. 1817(b)(2)(A)(i), the FDIC could only assess Savings Fund members to the extent necessary to maintain the Savings Fund at that level. Because the amendment to 12 U.S.C. 1441(f)(2) severing the statutory relationship between the Savings Fund and FICO did not become effective until January 1, 1997, however, FICO could only assess Savings Fund members to the extent authorized under 12 U.S.C. 1817 to cover its bond interest obligation for the fourth quarter of 1996.
 
 
 10
 On May 30, 1996, before the 1996 Act was enacted, FICO sent a memorandum to the FDIC requesting funding of $396,665,000for the period of July 1 through December 31, 1996. On August 31, 1996, the FDIC sent invoices to the Savings Fund member institutions for the fourth quarter 1996 Savings Fund and FICO assessments. On September 30, 1996, the day the President signed the Act into law, the FDIC collected the fourth quarter Savings Fund and FICO assessments and transmitted to FICO its portion. On October 16, 1996, the FDIC issued a final rule imposing the special assessment ordered by the Act, to be collected on November 27, 1996. See 61 Fed. Reg. 53,834 (1996). Since the special assessment capitalized the Savings Fund retroactive to October 1, the FDIC also issued on October 16 a notice of proposed rulemaking to revise the fourth quarter assessment schedules so as to refund the fourth quarter Savings Fund assessment collected on September 30, 1996. See 61 Fed. Reg. 53,867 (1996) (proposed Oct. 16, 1996).
 
 
 11
 On December 11, 1996, the FDIC Board held an open meeting to consider a final rule revising the fourth quarter Savings Fund assessment rates. At that meeting, the Board considered whether a refund of the fourth quarter FICO assessment was appropriate as well. While acknowledging that the statutes could be read otherwise, the Board rejected the legal interpretation favored by Bankers in this litigation in favor of what the Board deemed to be "the better reading."The Board concluded that the statutory relationship between the FICO and Savings Fund assessments should be construed to satisfy congressional intent that FICO be funded, that FICO's needs fell within the scope of "any other factors that the Board of Directors may deem appropriate" under 12 U.S.C. 1817(b)(2)(A)(ii)(IV), and that the FDIC serves purely a custodial role in collecting and disbursing the FICO assessments, thus has no authority to refund the fourth quarter 1996 FICO assessment. The final rule adopting the revised assessment schedules, including the Savings Fund refund but no FICO refund, was issued December 24, 1996.See 61 Fed. Reg. 67,687 (1996) (codified as amended at 12 C.F.R. 327.3-327.10).
 
 
 12
 Bankers sued under the Administrative Procedure Act (APA) seeking a declaratory judgment that its members are statutorily entitled to a refund of the FICO portion of the September 30, 1996, assessment.[1] The district court applied the two-part test of Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), to the FDIC Board's interpretation of the statutory scheme, and found that the FDIC's decision not to refund the FICO portion of the fourth quarter 1996 assessments "was neither arbitrary, capricious, nor otherwise unlawful." America's Community Bankers v. FDIC, 31 F. Supp. 2d 137, 141 (D.D.C. 1998). Additionally, the district court found that the refund sought by Bankers was not available under 5 U.S.C. 702: Because the FDIC had disbursed the funds to FICO immediately upon collection, the FDIC lacked the particular res required for recovery under the APA. See id. at 142 (citing City of Houston v. Department of Hous. and Urban Dev., 24 F.3d 1421, 1428 (D.C. Cir. 1994)). The court suggested that Bankers should sue FICO for relief instead.
 
 III. Article III Standing
 
 13
 First, the FDIC challenges Bankers's standing before this court, a contention which we must address before proceeding to the merits of Bankers's claim. To meet the case or controversy requirement of Article III of the United States Constitution, a plaintiff must demonstrate that he has suffered injury in fact, that the injury is fairly traceable to the defendant's actions, and that a favorable decision will redress the plaintiff's injury. See Bennett v. Spear, 520 U.S. 154, 162(1997); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). The FDIC does not challenge Bankers's satisfaction of the injury-in-fact element,[2] but asserts that Bankers cannot satisfy the causation and the redressability requirements for Article III standing. To establish causation, Bankers must demonstrate a causal link between the injury to its members and the FDIC's conduct, that is that the injurious conduct is fairly traceable to the FDIC's actions, as opposed to the independent action of a third party not before the court. See Defenders of Wildlife, 504 U.S. at 560-61. To satisfy the redressability requirement, Bankers must establish that it is likely, as opposed to merely speculative, that a favorable decision by this court will redress the injury suffered. See id.
 
 A. Causation
 
 14
 The FDIC suggests that, to satisfy the causation element of the standing analysis, the challenged agency must have been the driving force behind the injurious conduct. Employing this standard, the FDIC maintains that it did not cause the injury to Bankers's members because it was only a conduit, a passive intermediary acting entirely on FICO's behalf and at FICO's instruction. Contrary to the FDIC's assertion, our precedents generally do not require so high a degree of independent agency action for a finding of causation. We have held in several recent opinions that the causation element is satisfied by a demonstration that an administrative agency authorized the injurious conduct. See, e.g., Animal Legal Defense Fund (ALDF) v. Glickman, 154 F.3d 426, 440-43 (D.C. Cir. 1998) (en banc); Bristol-Myers Squibb Co. v. Shalala, 91 F.3d 1493, 1499 (D.C. Cir. 1996);Telephone and Data Sys., Inc. v. FCC, 19 F.3d 42, 46-47 (D.C. Cir. 1994). In ALDF v. Glickman, we held that even agency action which implicitly permits a third party to behave in an injurious manner offers enough of a causal link to support a lawsuit against the agency. See 154 F.3d at 44043. In short, our precedents suggest that an agency does not have to be the direct actor in the injurious conduct, but that indirect causation through authorization is sufficient to fulfill the causation requirement for Article III standing.
 
 
 15
 In the present case, the FDIC was more involved in both the assessment and collection processes than our precedents require. Both before and after the 1996 Act, FICO was statutorily required to obtain "the approval of the Board of Directors of the [FDIC]" in assessing Savings Fund member institutions. 12 U.S.C.A. 1441(f)(2) (West Supp. 1999); see also 12 U.S.C. 1441(f)(2) (1994). Even if the FDIC is correct that it could not collect the semiannual FICO assessment without FICO's permission, clearly 12 U.S.C. 1441(f)(2) contemplates that FICO could not assess Savings Fund member institutions without FDIC approval, either. The FDIC's own deliberations over whether or not to refund the FICO portion of the funds collected on September 30, 1996, suggest that, contrary to its position here, the FDIC viewed itself as playing an active role in the assessment process. Moreover, once the assessments were final, the FDIC was solely responsible for collecting the funds from Savings Fund members. So while the FDIC's involvement in the FICO assessment was perhaps something less than we often see, cf. Bennett v. Spear, 520 U.S. at 169-70; Northeast Energy Assocs. v. FERC, 158 F.3d 150, 153-54 (D.C. Cir.1998), the FDIC's actions are well within the outer boundary of causation established by ALDF v. Glickman and the cases discussed therein.
 
 B. Redressability
 
 16
 In its suit against the FDIC, Bankers seeks a declaratory judgment that 12 U.S.C. 1441 and 1817, as of October 1, 1996, limited the fourth quarter 1996 Savings Fund assessment (including the FICO assessment portion) to the rate necessary to maintain the Savings Fund at the 1.25% designated reserve ratio. See Appellant's Br. at 2. Bankers also seeks a declaration that its members are entitled to a refund from the FDIC of all fourth quarter assessments exceeding that amount--in other words, a refund of the fourth quarter FICO assessment paid September 30, 1996--plus interest and costs. See id. The FDIC maintains that a decision against it will not redress the injury to Bankers's members because the FDIC does not control the funds it collects on FICO's behalf and does not have the authority to use the Bank Fund and Savings Fund reserves it does control to provide a refund.Bankers responds that the FDIC still must approve FICO assessments and continues to be actively involved in the structure and timing of those assessments. Moreover, Bankers claims that 12 U.S.C. 1817(e)(1) gives the FDIC the statutory authority to make the requested refund. Thus, the parties perceive that whether a favorable decision by this court would redress the injury to Bankers's members turns upon whether the FDIC has the authority either to pay the refund sought by Bankers or to require FICO to pay it.
 
 
 17
 The parties misconstrue the inquiry. The redressability element does not depend upon the defendant's financial ability to pay a judgment against it. Courts do not deny a plaintiff his day in court simply because the defendant may be unable to pay all or part of a potential judgment against it.Indeed, courts regularly grant awards against defendants who cannot pay, then leave the problems of collection to the prevailing plaintiffs. As a general rule, governing statutes do not explicitly authorize agencies to pay judgments against them, presumably because such statutes do not typically address the consequences of agencies overstepping their authority. Instead, Congress has promulgated statutes like the APA to waive sovereign immunity and authorize parties aggrieved by agency actions to seek relief against the offending agencies in court. See generally 5 U.S.C. 702 (1994).If an agency errs, the agency is liable, to the extent that Congress has waived the government's immunity from suit. Premising redressability on the agency's explicit authority to pay contradicts the premise of agency accountability which underlies the APA.
 
 
 18
 The law does not require that the challenged agency be able to pay before the redressability element for Article III standing is satisfied. Instead, the law only requires that the relief requested, if granted, will resolve the injury. In Natural Resources Defense Council v. Pena, 147 F.3d 1012 (D.C. Cir. 1998), for example, the appellants sought an injunction precluding a government agency from using a particular report prepared by a committee organized and operated in violation of the Federal Advisory Committee Act (FACA).We concluded that the NRDC failed to satisfy redressability for two reasons: First, the NRDC could not demonstrate that denying use of the report would redress the injury caused by past FACA violations; and second, even if ongoing FACA violations continued to injure the NRDC, the injunction sought would do nothing to resolve ongoing violations. See id. at 1021-22. In contrast, the relief that Bankers seeks would redress the alleged injury by giving Bankers's members their money back, so long as they could collect the award.
 
 
 19
 Where an agency rule causes the injury, the redressability requirement may be satisfied as well by vacating the challenged rule and giving the aggrieved party the opportunity to participate in a new rulemaking the results of which might be more favorable to it. See, e.g., Lepelletier v. FDIC, 164 F.3d 37, 43 (D.C. Cir. 1999) (citing Northeast Energy Assocs. v. FERC, 158 F.3d at 154; Motor & Equip. Mfrs. Ass'n v. Nichols, 142 F.3d 449, 457-58 (D.C. Cir. 1998)). If we order the relief that Bankers seeks, the FDIC would issue new fourth quarter 1996 schedules assessing a lesser amount, in essence revoking its approval of the FICO assessment retroactively, as it did with the fourth quarter 1996 Savings Fund assessment, and entitling Bankers's members to a refund.
 
 
 20
 Finally, collectibility is not in fact a problem in this case.At oral argument, the FDIC conceded that it could utilize its approval authority to require FICO to offer Bankers's members a credit against future assessments if this court were to find for Bankers on the merits. Thus, while several lines of analysis appear to support Bankers's satisfaction of the redressability requirement for Article III standing, at a minimum, the FDIC's ability to offer a remedy in the form of a credit is sufficient to establish redressability. On that basis, we hold that Bankers has standing to bring this claim for declaratory relief against the FDIC.
 
 IV. Money Damages
 
 21
 The FDIC additionally contests our jurisdiction under the APA to consider Bankers's request for declaratory relief.That provision limits judicial review of claims challenging agency actions to those "seeking relief other than money damages." 5 U.S.C. 702. Relying upon our opinion in City of Houston v. Department of Hous. and Urban Dev., 24 F.3d 1421, 1428 (D.C. Cir. 1994), the district court held that, since the FDIC was merely a conduit for the payment of funds by the Savings Fund member institutions to FICO, the FDIC did not retain the specific res from which a refund could be paid; thus, it held, the refund Bankers seeks is unavailable under 5 U.S.C. 702. See America's Community Bankers, 31 F. Supp. 2d at 141-42. In other words, since the FDIC no longer holds the funds paid by Bankers's members for the fourth quarter of 1996, a refund constitutes money damages beyond the scope of the APA's jurisdictional grant. Bankers suggests that the district court misconstrued City of Houston and interpreted 5 U.S.C. 702 too narrowly.
 
 
 22
 The pivotal analysis in distinguishing specific relief available under the APA from unavailable money damages comes from our opinion in Maryland Dep't of Human Resources v. Department of Health and Human Servs., 763 F.2d 1441 (D.C. Cir. 1985), which the Supreme Court adopted in Bowen v. Massachusetts, 487 U.S. 879 (1988). Not all forms of monetary relief are money damages. See Maryland Dep't of Human Resources, 763 F.2d at 1447. Rather, money damages represent compensatory relief, an award given to a plaintiff as a substitute for that which has been lost; specific relief in contrast represents an attempt to restore to the plaintiff that to which it was entitled from the beginning. See id. at 1446. Maryland Department of Human Resources, Bowen, and subsequent cases focus on the nature of the relief sought, not on whether the agency still has the precise funds paid.
 
 
 23
 Where a plaintiff seeks an award of funds to which it claims entitlement under a statute, the plaintiff seeks specific relief, not damages. See, e.g., Bowen, 487 U.S. at 901; Maryland Dep't of Human Resources, 763 F.2d at 1446-48; National Ass'n of Counties v. Baker, 842 F.2d 369, 373 (D.C. Cir. 1988);Aetna Cas. & Sur. Co. v. United States, 71 F.3d 475, 478-79 (2d Cir. 1995); Dia Navigation Co. v. Pomeroy, 34 F.3d 1255, 1266-67 (3d Cir. 1994). In the present case, Bankers maintains that the statutory scheme, as it was for the fourth quarter of 1996, required the FDIC to provide for a FICO assessment refund in the revised assessment schedules promulgated in December 1996. If Bankers is correct that the FDIC violated its statutory obligation by adopting revised assessment schedules which permitted an overcharge, then under establishedand binding precedent, Bankers's claim represents specific relief within the scope of 5 U.S.C. 702, not consequential damages compensating for an injury. That the FDIC no longer possesses the precise funds collected is not determinative of this analysis.
 
 
 24
 Our precedent in City of Houston does not preclude Bankers's claim. In that case, Houston sued HUD for congressionally appropriated grant money that HUD first allocated to Houston, then reallocated elsewhere after Houston failed to meet spending targets. The FDIC notes that we rejected Houston's argument that HUD could use other funds at its disposal to pay its claim and concluded that "specific relief" under section 702 requires payment "out of a specific res."City of Houston, 24 F.3d at 1428. The FDIC argues that Bankers's claim is analogous to Houston's, as Bankers suggests that if the FDIC does not have adequate authority to pay a refund from FICO funds, the FDIC could use Savings Fund reserves instead. This resemblance is superficial, however.
 
 
 25
 The principal issue in City of Houston was mootness, not the question of allowable specific relief as opposed to unavailable money damages. We dismissed Houston's claim as moot because the grant funds were contractually obligated to another recipient and the appropriation in question had lapsed. See id. at 1427. We rejected Bowen as inapplicable in view of the Appropriations Clause of the Constitution. Because the Appropriations Clause precludes a distribution of money from the Treasury unless appropriated by Congress, we held that we had no authority to provide monetary relief by ordering reapplication of lapsed or fully obligated appropriations. See id at 1428. The commitment of the appropriated funds to other recipients and the expiration of the congressional appropriation eliminated Houston's particular entitlement to government monies. Outside the appropriations process, HUD had no statutory, regulatory, or other legal obligation or authority to distribute funds to Houston. Under those circumstances, an award from other available HUD funds not only would have represented compensation for Houston's loss of the grant money--thus money damages as opposed to specific relief--but also would have created a separation of powers encroachment under the Appropriations Clause of the Constitution. The City of Houston petitioners sought to have us control the appropriation of funds, or the distribution of appropriated funds, while the present case does not directly implicate appropriated funds, but rather seeks restoration of funds allegedly taken wrongfully by assessment from Bankers's member institutions.
 
 
 26
 Whereas City of Houston addressed whether a court could award to a claimant funds which otherwise belonged to the government, this case questions whether the government can retain funds which originally belonged to Bankers's members. Unlike Houston, Bankers is not seeking compensation for economic losses suffered by the government's alleged wrongdoing; Bankers wants the FDIC to return that which rightfully belonged to Bankers's member institutions in the first place. Bankers alleges that the FDIC violated the terms of 12 U.S.C. 1441 and 1817 by assessing more in the fourth quarter of 1996 than the statutory scheme permitted. If Bankers is correct in its statutory interpretation, then the FDIC improperly collected money from Bankers's members, and they are entitled under the statutory scheme to get their money back. The FDIC cannot eliminate the entitlement of Bankers's member institutions to reimbursement by distributing the improperly collected funds elsewhere.
 
 
 27
 The FDIC also cites Department of the Army v. Blue Fox, Inc., 119 S. Ct. 687 (1999), as supporting the district court's conclusion. In Blue Fox, a prime contractor on a government contract failed to pay a subcontractor, who then sued the Army seeking an equitable lien on any funds available or appropriated for the project and an order directing payment of those funds. TheSupreme Court held that, since the subcontractor's claim for specific relief was against the defaulting prime contractor, an equitable lien represented compensatory or substitute relief, thus money damages. See id. at 692. The present case is different because the FDIC's responsibility for the alleged over assessment is not purely subsidiary to FICO's. Unlike the Army in Blue Fox, the FDIC at least shares with FICO primary responsibility for the alleged wrongdoing. Although the FDIC disclaims any active role in the alleged injurious conduct, as we have already discussed, the FDIC's characterization is inaccurate. Since the FDIC shares direct responsibility for assessing and collecting the FICO assessment, Bankers's claim for monetary relief is equitable, like the claims in Bowen and Maryland Department of Human Resources, not compensatory, like the claim in Blue Fox.
 
 
 28
 Regardless, even if we were to order a refund in this case, no transfer of funds would be necessary to follow our command. At oral argument, the FDIC conceded that it had the authority to offset Bankers's members' future FICO assessments by the amount of any refund this court might order. In other words, if we found for Bankers on the merits, we could order the FDIC to give them a credit against future FICO assessments as opposed to a cash refund of past assessments. Bankers agreed that such a remedy would be functionally equivalent to the relief it seeks. These concessions render the FDIC's cash position both practically and legally irrelevant. For these reasons, we hold that the remedy sought by Bankers does not constitute money damages. Thus we have power under 5 U.S.C. 702 to consider the merits of Bankers's claim.
 
 V. Alleged Issues of Fact
 
 29
 Bankers challenges the district court's grant of summary judgment on the ground that the court improperly resolved genuine issues of material fact which should be left to a jury. Bankers raises three allegedly key facts as in dispute: First, whether FICO could have met its interest payment obligations in the fourth quarter of 1996 without the special assessment; second, whether the FDIC played an active or passive role with respect to the assessment; and third, whether the FDIC is capable of paying a refund. An appellate court reviews a grant of summary judgment de novo, applying the same standard as governed the district court's decision. See Greene v. Dalton, 164 F.3d 671, 674 (D.C. Cir. 1999). Accordingly, we must determine whether a genuine issue of material fact exists in this case. See Byers v. Burleson, 713 F.2d 856, 859 (D.C. Cir. 1983).
 
 
 30
 Bankers's claim misapprehends the district court's decision and the nature of the inquiry at hand. Summary judgment is appropriate when evidence on file shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Not all alleged factual disputes represent genuine issues of material fact which may only be resolved by a jury. "Material facts are those 'that might affect the outcome of the suit under governing law,' and a genuine dispute about material facts exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Farmland Indus., Inc. v. Grain Board of Iraq, 904 F.2d 732, 735-36 (D.C. Cir. 1990) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The "factual issues" raised by Bankers do not meet this standard.
 
 
 31
 With respect to FICO's ability to meet its interest payment obligation, the FDIC's concern was with the construction of the statutory funding scheme overall. The FDIC at no point in the record said that FICO could not make its fourth quarter 1996 interest payment unless it retained the funds collected on September 30, 1996. Instead, the FDIC reasoned that Bankers's interpretation of the statute could yield inconsistent funding and disrupt FICO's ability to meet its bond interest obligation, that another reading wouldgenerate a more stable cash flow for FICO, and that the stable cash flow was consistent with congressional intent. Thus, the FDIC's discussion of FICO's ability to meet its bond interest obligation represents statutory construction, not fact finding, and the district court appropriately treated it as such.
 
 
 32
 The nature of the FDIC's role in the FICO assessment process is also a legal, not a factual, question. The adequacy of the Savings Fund reserves is not a material fact because it is not relevant. But even if we considered these allegedly factual disputes to be issues of fact, and a jury found that the FDIC was an active participant, that finding would only influence whether Bankers clears the Article III standing hurdle, a question which we have already decided in Bankers's favor as a matter of law; and for a jury to find that the Savings Fund reserves are adequate to cover the refund would resolve nothing. Neither finding would inform the question of whether the FDIC properly interpreted its statutory obligation with respect to the FICO assessment. Put simply, even if Bankers were correct in characterizing these so-called disputes as issues of fact, they do not involve material facts because they have no bearing on the outcome of the case. This case turns on whether the FDIC properly interpreted the statutory scheme governing Savings Fund and FICO assessments, not on determinations of fact. The district court did not invade the jury's province.
 
 VI. Statutory Interpretation
 
 33
 Accordingly, we turn to the bottom line of the present case: whether the FDIC properly construed its authority and obligations under 12 U.S.C. 1441 and 1817. Prior to the enactment of the 1996 Act and through January 1, 1997, 12 U.S.C. 1441(f)(2) provided that the FICO assessment "shall not exceed the amount authorized to be assessed against Savings Association Insurance Fund members pursuant to [12 U.S.C. 1817]...." 12 U.S.C. 1441(f)(2) (1994); see also Pub. L. 104-208, 2703(a), (c), 110 Stat. 3009, 3009-485 to 3009-486 (1996) (making the amendments to 1441(f)(2) effective only with respect to semiannual periods beginning after December 31, 1996). As of September 30, 1996, however, 12 U.S.C. 1817(b)(2)(A)(i) required the FDIC Board to
 
 
 34
 set semiannual assessments for insured depository institutions when necessary and only to the extent necessary... to maintain the reserve ratio of each deposit insurance fund at the designated reserve ratio; or ... if there serve ratio is less than the designated reserve ratio, to increase the reserve ratio to the designated reserve ratio....
 
 
 35
 12 U.S.C.A. 1817(b)(2)(A)(i) (West Supp. 1999). The statute instructed the FDIC Board in carrying out that task to consider the Savings Fund's expected operating expenses, case resolution expenditures and income, the effect of assessments on members' earnings and capital, and "any other factors that the Board of Directors may deem appropriate."Id. 1817(b)(2)(A)(ii). The statute also precluded the FDIC Board from setting the Savings Fund assessments "in excess of the amount needed ... to maintain the reserve ratio of the fund at the designated reserve ratio; or ... if the reserve ratio is less than the designated reserve ratio, to increase the reserve ratio to the designated reserve ratio." Id. 1817(b)(2)(A)(iii). Notably, the limitation on assessment codified in 12 U.S.C. 1817(b)(2)(A)(iii) was part of the 1996 Act, and thus became effective September 30, 1996. Additionally, even though the changes to 12 U.S.C. 1441(f)(2) severing the link between the FICO and Savings Fund assessments were not effective until January 1, 1997, the portion of 12 U.S.C. 1817(b)(2) which addressed the FICO assessment was repealed effective September 30, 1996: "Notwithstanding any other provision of this paragraph, amounts assessed by the Financing Corporation under section 1441 of this title against Savings Association Insurance Fund members shall be subtracted from the amounts authorizedto be assessed by the Corporation under this paragraph." 12 U.S.C. 1817(b)(2)(D) (1994); see also Pub. L. No. 104-208, 2703(b), 110 Stat. 3009, 3009-485 (1996) (repealing 1817(b)(2)(D)).[3]
 
 
 36
 Bankers asserts that the plain meaning of these provisions as they read for the fourth quarter of 1996 unambiguously excused Savings Fund members from paying fourth quarter 1996 assessments in excess of the amount necessary for the Savings Fund to achieve or maintain the designated 1.25% reserve-to-deposits capitalization ratio. Congress, through the 1996 Act, ordered the FDIC to set and collect a special assessment sufficient to raise the Savings Fund reserves to the designated reserve ratio as of October 1, 1996, and limited the Savings Fund assessment to the amount needed to maintain the Savings Fund reserves at that level. But Congress preserved the statutory link between the FICO and Savings Fund assessments until January 1, 1997. Therefore, Bankers argues, Congress clearly intended to limit the fourth quarter FICO assessment. As the fourth quarter FICO assessment had already been collected when the Act came into effect, Bankers argues a refund is required, as with the fourth quarter Savings Fund assessment. Bankers suggests that the FDIC's approach reduces 12 U.S.C. 1441(f)(2) to an instruction for the FDIC to allocate to FICO whatever amounts FICO requested, while 12 U.S.C. 1441(f)(2) clearly limited the FICO assessment to the amount necessary to achieve or maintain the Savings Fund at the designated reserve ratio.
 
 
 37
 The FDIC, in contrast, maintains that the only reasonable interpretation of the statutory scheme as a whole, both before the 1996 Act and through the fourth quarter of 1996, was for the Savings Fund assessment to include the amounts necessary for both the Savings Fund and FICO. Before the Act required a special assessment raising the Savings Fund reserves to the designated ratio, 12 U.S.C. 1817(b)(3)(B) ordered the FDIC to bring the Savings Fund to that level within a fifteen year time frame. As the FDIC sees it, if Bankers's interpretation of the pre-1996 statutory scheme is correct, then the FDIC would have had to satisfy the requirements of FICO and the Savings Fund both out of the assessment necessary to fund the Savings Fund alone, and the Savings Fund could not have achieved the designated reserve ratio within the required fifteen year period. Moreover, as the Savings Fund approached and achieved the designated level, FICO would have received less and less, then nothing at all unless the Savings Fund fell below that ratio. Such an outcome, it argues, would contradict Congress's clear intent to provide FICO with the funding necessary to satisfy its bond interest payment obligations. Under its own interpretation, the statutory scheme merely precluded the FDIC from assessing for the Savings Fund's needs until it had assessed an amount adequate to fund FICO, and the FDIC could maintain a stable cash flow for FICO even after the Savings Fund attained the designated reserve ratio. Moreover, the statute does not provide for a refund of the FICO assessment. If Congress intended a refund, the FDIC asserts, it would have provided for one.
 
 
 38
 The overall statutory scheme involves a statute over which the FDIC does not possess administrative authority, 12 U.S.C. 1441. Ordinarily, an agency's interpretation of a statute it does not administer is not entitled to deference. See, e.g., Professional Reactor Operator Soc'y v. United States Nuclear Regulatory Comm'n, 939 F.2d 1047, 1051 (D.C. Cir. 1991). Nevertheless, because the FDIC's actions derive principally from its interpretation of 12 U.S.C. 1817(b)(2), which it does administer, the two-step Chevron inquiry is appropriate here. See Chevron,467 U.S. at 842-43.Under the Chevron standard, if Congress has directly spoken to the issue, and the intent of Congress is clear, then there is nothing for the agency to interpret, and the court must give effect to the unambiguous expression of Congress. See id.If, however, the court decides that the statute is ambiguous, then the court determines only whether the agency's interpretation is a reasonable one. See id.
 
 
 39
 Turning to the first step of the analysis, we cannot agree with Bankers that the plain meaning of 12 U.S.C. 1441(f)(2) and 12 U.S.C. 1817(b)(2) required the FDIC to refund the FICO assessment. Neither can we concur with the FDIC's claim that these provisions explicitly precluded a refund. Indeed, both parties offer reasonable interpretations of the proper functioning of the statutory scheme. In our view, the intersection of 12 U.S.C. 1817(b)(2)(A) and 12 U.S.C. 1441(f)(2) was somewhat ambiguous even before the Act, and the staggered effective dates imposed by the Act substantially compounded that ambiguity.
 
 
 40
 We note however that 12 U.S.C. 1817(b)(2)(A) gives the FDIC the authority to "set" the Savings Fund assessment amount, then articulates several factors including the "any other factors" element for the FDIC to consider in doing so. In its notice of final rulemaking and before this court, the FDIC asserted that the pre-1996 Act statutory scheme in effect when the assessment at issue was collected, as well as the "any other factors" language of 12 U.S.C. 1817(b)(2)(A)(ii) which survived the Act, gave it some discretion to deny a FICO assessment refund on the ground that such a refund would imperil FICO funding. See 61 Fed. Reg. at 67,692; Appellee's Br. at 26-27, 30, 32. Although each party argued that the case should be resolved in its favor at Chevron step one, our conclusion that the statutory scheme is facially ambiguous and our acceptance of the FDIC's claim that 12 U.S.C. 1817(b)(2)(A)(ii) allows it some discretion over these matters permit us to move to the second phase of the Chevron analysis.
 
 
 41
 We recognize that the FDIC's interpretation of the provisions in question has been inconsistent. Indeed, in its final rule addressing the refund issue, the FDIC blamed the FICO allocation for the Savings Fund's failure to receive the full amount of the revenues that the Savings Fund assessments generated prior to the Act. See 61 Fed. Reg. 67,687 & n.1 (1996). The FDIC noted that, "[t]hrough the end of 1996, the FICO draw serves to reduce the amounts that the FDIC assesses against [Savings Fund]-member savings associations." Id. at 67,688 (citing 12 U.S.C. 1441(f)(2)). Only after 1996, the FDIC claimed, would FICO assessments be "independent of and in addition to those of the FDIC." Id. at 67,688 & n.2. These statements suggest that the FDIC's December 1996 interpretation of the pre-Act statutory scheme was in line with Bankers's interpretation here. Moreover, in challenging Bankers's standing to raise the refund claim, the FDIC maintained before this court that it had no discretion with respect to the FICO assessment, but was merely a passive collection agent and conduit for the assessed funds.
 
 
 42
 However, despite these inconsistencies, the FDIC in its rulemaking process clearly considered the alternative interpretations of the statute, and settled on a construction that is at least permissible. For the most part, the FDIC has continued to support this construction throughout the litigation, even if at times it has advanced additional, somewhat contradictory positions as well. Thus, under the deferential Chevron standard, we conclude that the FDIC's interpretation of 12 U.S.C. 1817 was a reasonable one which we must respect. We conclude as well that the FDIC, in declining to refund the fourth quarter 1996 FICO assessment, did not act arbitrarily, capriciously, or otherwise contrary to the law.
 
 
 43
 Both in the district court and before us, the FDIC has advanced the additional argument that the amended statutory language effective October 1, 1996, bars the FDIC only from "set[ting]" assessments and from "assess[ing]" amounts in excess of statutory limitations. 12 U.S.C. 1441(f)(2)(A)(i)(ii), 1817(b)(2)(A)(i), (iii). Because the assessment in this case was "set" no later than May 30, 1996, by memorandum from FICO to the FDIC and "assessed" on or about August 31, 1996, when the FDIC sent invoices to the saving institutions, both events, potentially barrable by the amended statute, occurred well before the effective date of the statutory change. As the FDIC points out, Bankers has not even argued that the fourth quarter 1996 FICO assessment was unlawful under the statutory scheme as it existed prior to the October 1, 1996, effective date of the amendment. Because nothing in the new statute requires the FDIC to reconsider the previously set lawful assessment, the FDIC argues that the language upon which Bankers relies is not applicable to the assessment at issue. We find this argument to be a persuasive one.
 
 
 44
 The principal drawback with this additional argument of the FDIC is that the FDIC did not rely upon it or even discuss it during the rulemaking process as the basis for its decision not to refund the fourth quarter FICO assessment.Thus, we cannot apply to this interpretation of the statutory words "set" and "assess" the same Chevron deference we afforded to the FDIC's "any other factors" analysis discussed above. This does not, however, mean that we may not consider the argument, or even rely on the interpretation. It is true, of course, that a court can only uphold the decision of an administrative agency on those grounds "upon which the record discloses that its action was based." SEC v. Chenery Corp., 318 U.S. 80, 87 (1943). Courts are not commissioned to remake administrative determinations on different bases than those considered and relied upon by the administrative agencies charged with the making of those decisions.
 
 
 45
 An obvious corollary to this principle is that post hoc rationalizations cannot support an affirmance of an agency decision based on an otherwise invalid rationale. See, e.g., Citizens to Preserve Overton Park v. Volpe, Inc., 401 U.S. 402, 419-20 (1971). This principle applies as well to our review of statutory interpretations under the second prong of Chevron. As we stated in City of Kansas City v. Department of Hous. & Urban Dev., 923 F.2d 188 (D.C. Cir. 1991), "[i]n whatever context we defer to agencies, we do so with the understanding that the object of our deference is the result of agency decisionmaking, and not some post hoc rationale developed as part of a litigation strategy." Id. at 192.
 
 
 46
 However, the FDIC does not ask us to do anything barred by Chenery or Kansas City. The corporation does not seek before us to substitute a post hoc, and therefore unacceptable, rationale for an otherwise invalid rationale rejected by the court on review. Rather, the FDIC, in defending the reasonableness of its interpretation of one part of the relevant statute subject to the second prong of the Chevron analysis, offers a persuasive interpretation of other words of that same statute consistent with the interpretation it seeks to have us uphold under Chevron. The FDIC does not claim, and we do not hold, that its interpretation of "set" and "assess" independently carries the day in our review of its decision. Were we to so hold, we might well be countenancing the sort of post hoc-ery we have rejected in prior cases. But again, that is not what we do in the present analysis. Rather, the FDIC argues, and we hold, that the apparent legal meanings of the statutory terms "set" and "assess" are consistent with the FDIC's interpretation of the "any other factor" rationale in fact relied upon by the FDIC and reviewed by us under the Chevron standard. There is no difficulty in ourreviewing the statutory language de novo. That is, after all, what courts do.
 
 
 47
 It is fixed law of Chevron jurisprudence, applicable to the "any other factors" interpretation, that we may employ the traditional tools of statutory interpretation in determining both whether the meaning of the language is clear at Chevron step one and whether the agency's interpretation is a reasonable one at Chevron step two. See, e.g., Bell Atlantic Tel. Cos. v. FCC, 131 F.3d 1044, 1049 (D.C. Cir. 1997); American Fed'n of Gov't Employees v. FLRA, 798 F.2d 1525, 1528 (D.C. Cir. 1986). Consistency of interpretation of one portion of a statute with the apparent meaning of another portion is a traditional tool of statutory interpretation. See, e.g., Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 118 S. Ct. 956, 962 (1998); Atwell v. Merit Sys. Protection Bd., 670 F.2d 272, 286 (D.C. Cir. 1981). Therefore, the argument is properly before us; it is also convincing. The FDIC's interpretation of the "any other factors" language of 12 U.S.C. 1817(b)(2)(A)(ii)(IV) yields a result consistent with the apparent congressional goal of 12 U.S.C. 1441(f)(2)(A)(i)-(ii) and 1817(b)(2)(A)(i) and (iii). This is evidence that the FDIC's interpretation of the statutory scheme is reasonable.The opposing interpretation advanced by appellants is not so consistent with the apparent congressional intent of the other section. Therefore, the FDIC's interpretation is not only reasonable, but the more reasonable of those before us, even if we subjected it to a more stringent standard than Chevron analysis. It does no violence to Chenery or Kansas City principles for an agency to advance a legal argument in support of its administrative position which bolsters rather than duplicates the consistent position upon which its decision was made below.
 
 Conclusion
 
 48
 In summary, we hold that Bankers satisfies the requirements for Article III standing, and that the remedy Bankers seeks represents relief other than money damages within the context of 5 U.S.C. 702. As a result, we are able to consider the merits of Bankers's claim. Upon consideration of those merits, however, we hold that the district court did not improperly invade the jury's province and resolve genuine issues of material fact; and we hold that the FDIC's interpretation of the relevant statutory scheme is a reasonable one entitled to Chevron deference and is not arbitrary, capricious, or otherwise contrary to the law. For these reasons, we affirm the district court's grant of summary judgment in favor of the FDIC.
 
 
 
 Notes:
 
 
 [1]
 Under the APA, reviewing courts hold unlawful and set aside only those agency actions or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A) (1994).
 
 
 [2]
 Bankers's standing rests on the concept of associational standing. A membership organization may sue to redress its members' injuries, even if the organization cannot demonstrate an injury to itself. See, e.g., UAW v. Brock, 477 U.S. 274 (1986); Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333 (1977);Warth v. Seldin, 422 U.S. 490 (1975). Our discussion therefore concerns injury to Bankers's member institutions, not the organization per se.
 
 
 [3]
 In its final rule, the FDIC took the view that section 2703(c) of the 1996 Act contained a misprint, and that the Act actually repealed 12 U.S.C. 1817(b)(2)(D) effective January 1, 1997. See 61 Fed. Reg. at 67,688 n.2. We do not need to resolve whether the FDIC is correct on this point to reach our conclusion.