**CITY OF HOUSTON, TEXAS, Appellant,**

v.

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., Appellees.**

**No. 92–5491.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 4, 1994.

Decided June 3, 1994.

**1424**

David L. Rose argued the cause for appellant. With him on the briefs was Otto J. Hetzel.

Robert L. Shapiro, Asst. U.S. Atty., argued the cause for appellees. With him on the brief were Eric H. Holder, Jr., U.S. Atty., and John D. Bates and R. Craig Lawrence, Asst. U.S. Attys.

Before: WALD, EDWARDS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

On August 9, 1986, the city of Houston, Texas, was awarded a $21.6 million Community Development Block Grant ("CDBG") for the fiscal year 1986. The award was made by the Department of Housing and Urban Development ("HUD"), which administers the grant program. Approximately four months after it made the grant, HUD notified Houston that it was reducing the amount of its CDBG by $2.6 million, because of the city's failure to meet spending targets. HUD subsequently reallocated the $2.6 million to other CDBG program participants during the succeeding fiscal year. By Act of Congress, the appropriation covering the disputed $2.6 million CDBG funds expired on September 30, 1988.

On April 4, 1989, Houston filed suit in the District Court requesting injunctive and declaratory relief, claiming that HUD could not reduce its CDBG without a hearing and seeking restoration of the funds that were deducted from its fiscal 1986 grant. The District Court granted summary judgment in favor of HUD, ruling that Houston's case was moot because the lapse of the appropriation from which fiscal 1986 CDBG monies were drawn meant that there were no funds available from which HUD could lawfully repay Houston. The trial court thus concluded that, even if the city's claims were found to be meritorious, no relief was available. Houston moved for reconsideration, arguing that HUD had other funds that could be used to restore the $2.6 million deducted from the city's 1986 grant. The District Court denied this motion, again ruling that there were no monies available from which the court could grant relief. Houston then appealed to this court.

 It is a well-settled matter of constitutional law that when an appropriation has lapsed or has been fully obligated, federal courts cannot order the expenditure of funds that were covered by that appropriation. Thus, we hold that Houston's claims for injunctive and monetary relief must be dismissed as moot. As for the request for declaratory relief, we find the city's claims unfit for judicial review and therefore dismiss for lack of ripeness.

## I. BACKGROUND

Houston is a so-called "entitlement city" under the CDBG program, meaning that it receives an annual grant from CDBG funds appropriated each year by Congress. Once a grant to an entitlement city is approved, it is ordinarily provided in the form of a letter of credit, which is increased annually by the amount of the grant. The grantee draws on the letter of credit during the year, and funds not used in one year can be carried over to the next. *See generally Kansas City v. HUD,* 861 F.2d 739, 740 (D.C.Cir.1988).

In the instant case, HUD penalized Houston because the city allegedly failed to disburse its CDBG funds in timely fashion, and so had a large backlog of grant monies in its letter of credit account. HUD's 1986 "Monitoring Report" found that Houston's credit balance ratio—the ratio of the year-end balance in the city's account to its yearly grant—stood at 2.8, meaning that Houston had almost three years' worth of CDBG monies that had not been allocated to eligible programs. On August 9, 1986, HUD awarded Houston $21,699,000 in CDBG monies for fiscal year 1986, which ran from July 1, 1986 through June 30, 1987. In order to promote

timely expenditure of the 1986 CDBG, HUD imposed special conditions on that grant. Houston's 1986 CDBG required the city to meet a set schedule for spending the funds in each quarter; if the city failed to meet this condition, HUD would reduce the grant in the following quarter by the amount which the city fell below the target figure.

By letter dated December 22, 1986, HUD notified Houston that it was reducing the city's 1986 grant by $2,660,486 because the city had failed to meet its first quarter spending target by that amount. HUD "de-obligated" this amount from Houston's letter of credit on December 30, 1986. During fiscal 1987, HUD reallocated the $2.6 million it had recovered from Houston in the previous fiscal year to hundreds of cities across the nation, as is required by section 106 of the Housing and Community Development Act of 1974 ("CDBG Act"), 42 U.S.C. § 5306 (1988 & Supp. IV 1992). By Act of Congress, the 1986 appropriation authorizing HUD to disburse the CDBG funds at issue in this case expired on September 30, 1988. *See* Pub.L. No. 99–160, 99 Stat. 909, 913 (1985). Houston filed suit in the District Court on April 4, 1989, alleging that HUD's reduction of its CDBG without a hearing violated section 111 of the CDBG Act, 42 U.S.C. § 5311(a) (1988), the Administrative Procedure Act ("APA") and its due process rights under the Fifth Amendment.

CDBG grantees are subject to two monitoring provisions. Section 104(e) of the CDBG Act, 42 U.S.C. § 5304(e) (1988), requires HUD to review each grantee at least annually to determine "whether the grantee has carried out its activities ... in a timely manner, ... and whether the grantee has a continuing capacity to carry out those activities in a timely manner," and permits HUD to make "appropriate adjustments in the amount of the annual grants."[1] Section 111 of the Act, in contrast, provides that *after notice and opportunity for hearing,* HUD may terminate, reduce, or limit CDBG payments to a grantee which "has failed to comply substantially" with the CDBG program.[2] In *Kansas City,* this court held that section 111, which provides for a hearing, covers HUD actions purporting to sanction grantees for *past* substantial noncompliance, while section 104(e), which has no explicit procedural requirements, is intended to ensure that *current* grants will be spent in compliance with the CDBG program. *See Kansas City,* 861 F.2d at 742–43.[3] In the instant case, Houston alleges that, because HUD's sanctions related to the city's past failures to disburse its CDBG monies, a hearing was required under section 111. HUD counters that it proceeded under section 104(e), because the conditions it attached to Houston's 1986 CDBG addressed only its rate of expenditure of a current grant.

**1.** Section 104(e) provides in relevant part that:

The Secretary shall, at least on an annual basis, make such reviews and audits as may be necessary or appropriate to determine—
(1) in the case of grants made under section 5306(b) or section 5306(d)(2)(B) of this title, whether the grantee has carried out its activities and, where applicable, its housing assistance plan in a timely manner, whether the grantee has carried out those activities and its certifications in accordance with the requirements and the primary objectives of this chapter and with other applicable laws, and whether the grantee has a continuing capacity to carry out those activities in a timely manner;....

\* \* \* \* \* \*

The Secretary may make appropriate adjustments in the amount of the annual grants in accordance with the Secretary's findings under this subsection.

42 U.S.C. § 5304(e) (1988).

**2.** Section 111 provides in relevant part that:
If the Secretary finds after reasonable notice and opportunity for hearing that a recipient of assistance under this chapter has failed to comply substantially with any provision of this chapter, the Secretary, until he is satisfied that there is no longer any such failure to comply, shall—
(1) terminate payments to the recipient under this chapter, or
(2) reduce payments to the recipient under this chapter by an amount equal to the amount of such payments which were not expended in accordance with this chapter, or
(3) limit the availability of payments under this chapter to programs, projects, or activities not affected by such failure to comply.
42 U.S.C. § 5311(a) (1988).

**3.** At the time *Kansas City* was decided, what is now section 104(e) was codified at section 104(d).

## II. DISCUSSION

### A. *Lapsed Appropriations and Mootness*

 The District Court granted summary judgment for HUD on mootness grounds, a ruling we review *de novo*. *See, e.g., Nikoi v. Attorney General of United States,* 939 F.2d 1065, 1068 (D.C.Cir.1991). Because we agree that this case was mooted by the expiration of the relevant appropriation, we affirm the decision of the trial court. "Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." *Iron Arrow Honor Soc'y v. Heckler,* 464 U.S. 67, 70, 104 S.Ct. 373, 374–375, 78 L.Ed.2d 58 (1983) *(per curiam)*. The instant case is moot because the panel can offer no relief which "can redress [appellant's] asserted grievance," *id.*—namely, the denial of over $2.6 million in CDBG funds.

 Funds appropriated for an agency's use can become unavailable in three circumstances: if the appropriation lapses; if the funds have already been awarded to other recipients; or if Congress rescinds the appropriation.[4] "[I]t is an elementary principle of the budget process that, in general, a federal agency's budgetary authority lapses on the last day of the period for which the funds were obligated. At that point, the unobligated funds revert back into the general Treasury." *West Va. Ass'n of Community Health Ctrs. v. Heckler,* 734 F.2d 1570, 1576 (D.C.Cir.1984) (citation omitted). There is an equitable doctrine, however, that permits a court to award funds based on an appropriation even after the date when the appropriation lapses, so long as "the lawsuit was instituted *on or before that date.*" *Id.* (emphasis added). This exception was noted in *National Association of Regional Councils v. Costle,* 564 F.2d 583 (D.C.Cir.1977):

> [T]he equity powers of the courts allow them to take action to preserve the status quo of a dispute and protect their ability to decide a case properly before them. In such situations, the courts simply suspend the operation of a lapse provision and extend the term of already existing budget

authority. If, however, budget authority has lapsed before suit is brought, there is no underlying congressional authority for the court to preserve. It has vanished, and any order of the court to obligate public money conflicts with the constitutional provision vesting sole power to make such authorization in the Congress. Equity empowers the courts to prevent the termination of budget authority which exists, but if it does not exist, either because it was never provided or because it has terminated, the Constitution prohibits the courts from creating it no matter how compelling the equities.

*Id.* at 588–89 (footnote omitted). As can be seen from the foregoing quotation, the equitable exception is narrow, and "[i]t is beyond dispute that a federal court cannot order the obligation of funds for which there is no appropriation." *Rochester Pure Waters Dist. v. EPA,* 960 F.2d 180, 184 (D.C.Cir. 1992).

Indeed, even if a plaintiff brings suit before an appropriation lapses, this circuit's case law unequivocally provides that once the relevant funds have been obligated, a court cannot reach them in order to award relief. In *West Virginia Health Centers,* for example, we acknowledged the equitable doctrine permitting courts to award funds after an appropriation has lapsed, if a suit is timely filed (as that case was), but held that no relief was available for one of the fiscal years in question because "all of these funds ha[d] been awarded by the Secretary to various recipients." 734 F.2d at 1577. We have relied on similar reasoning in at least two other cases. *See Ambach v. Bell,* 686 F.2d 974, 986 (D.C.Cir.1982) ("Once the chapter 1 funds are distributed to the States and obligated, they cannot be recouped. It will be impossible in the absence of a preliminary injunction to award the plaintiffs the relief they request if they should eventually prevail on the merits."); *Population Inst. v. McPherson,* 797 F.2d 1062, 1081 (D.C.Cir. 1986) (quoting *Ambach* and *West Virginia Health Centers,* and noting that "if the government in the instant case is permitted to

---

4. For a discussion of rescinded appropriations, a situation not presented in this case, see *Rochester* *Pure Waters Dist. v. EPA,* 960 F.2d 180 (D.C.Cir. 1992).

*distribute* the $10 million to other organizations, the appeal will become moot."). Thus, to avoid having its case mooted, a plaintiff must both file its suit before the relevant appropriation lapses *and* seek a preliminary injunction preventing the agency from disbursing those funds.

It is plain that Houston's case is moot on two independent grounds. HUD provided an affidavit in the District Court in support of its motion for summary judgment, stating that on or before September 30, 1988—more than six months before Houston filed its Complaint—the agency "contractually obligated its entire [fiscal year] 1986 CDBG entitlement appropriation from Congress, either through initial allocations or reallocations." Declaration of James R. Broughman, Director of Entitlement Cities Division, HUD, Joint Appendix at 87. Appellant in no way disputes this statement. It is also undisputed that the fiscal year 1986 CDBG appropriation lapsed on September 30, 1988, and that Houston did not seek a stay of the appropriation's expiration prior to that date.

■ Houston contends that even if its claim would be otherwise moot, the panel should reach the merits under the exception to the mootness doctrine that permits federal courts to consider cases that are "capable of repetition, yet evading review." *See, e.g., Southern Pac. Terminal Co. v. ICC,* 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). This exception has no force in this case, however. As noted above, our decisions specifically provide that if a case is timely filed, a court may grant a preliminary injunction so that funds from an appropriation that is about to lapse will remain available pending a dispute's resolution. Here, however, Houston filed its Complaint more than two years after HUD reduced its grant, and over six months after the 1986 CDBG appropriation expired. If appellant had acted expeditiously, it could have preserved its rights. The situation presented in the instant case is perhaps "capable of repetition," but it can be reviewed in the

future if Houston or another city files a timely suit and seeks a preliminary injunction. Because a stay of the lapse of the 1986 appropriation was potentially available, the duration of the challenged action was not "too short to be fully litigated prior to its cessation or expiration." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (*per curiam*).

## B. *Effect of* Bowen v. Massachusetts *on Mootness of Appellant's Claim*

Houston's chief argument in this appeal is that the Supreme Court's decision in *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), and several decisions by this court interpreting *Bowen* make relief available in this case. We find no merit in this argument. Whatever changes *Bowen* may have wrought in the law, it certainly did not repeal the Appropriations Clause of the Constitution.

■ *Bowen* addressed the scope of relief available under APA section 702, 5 U.S.C. § 702 (1988),[5] in light of the 1976 amendments to that section, which eliminated the defense of sovereign immunity in cases against the United States in which plaintiffs do not seek money damages. *See Bowen,* 487 U.S. at 892, 108 S.Ct. at 2731. In that case, Massachusetts argued that the Department of Health and Human Services ("HHS") had violated the Medicare statute by disallowing certain reimbursements. Massachusetts styled its suit as one seeking injunctive relief—an order that HHS pay the money it owed the state—rather than a claim seeking "money damages." The Supreme Court agreed with this characterization, holding that the suit sought *specific relief,* in the form of an order to pay out the actual funds HHS owed to Massachusetts, rather than monetary compensation for an injury. Accordingly, the Court held that the suit was permissible under APA section 702.

Houston argues at length that its suit is distinguishable from our cases discussing

**5.** APA Section 702 provides in relevant part:
An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed or relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.
5 U.S.C. § 702 (1988).

lapsed or fully obligated appropriations, because the instant Complaint, like that in *Bowen,* seeks injunctive relief under the APA and therefore sounds in equity. Appellant urges that: "The 1976 amendment to the APA is a waiver of sovereign immunity over grant-in-aid funding and other administrative decisions, and a grant of jurisdiction to the federal courts to review administrative decisions of federal agencies *with authority to grant full relief.*" Brief for Appellant at 35 (emphasis added). Appellant's argument is beside the point. Nothing in *Bowen* or its progeny even obliquely addresses the question of expired or fully obligated appropriations, and it is indisputable that *Bowen* did not amend the Constitution. As the Supreme Court recently explained in a case that post-dates *Bowen:*

> The Appropriations Clause of the Constitution, Art. I, § 9, cl. 7, provides that: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." For the particular type of claim at issue here, a claim for money from the Federal Treasury, the Clause provides an explicit rule of decision. Money may be paid out only through an appropriation made by law; in other words, the payment of money from the Treasury must be authorized by a statute....
>
> [The Appropriations Clause] means simply that no money can be paid out of the Treasury unless it has been appropriated by an Act of Congress.

*Office of Personnel Management v. Richmond,* 496 U.S. 414, 424, 110 S.Ct. 2465, 2471, 110 L.Ed.2d 387 (1990) (internal quotation omitted). When the relevant appropriation has lapsed or been fully obligated, as in this case, the federal courts are without authority to provide monetary relief. Even accepting, *arguendo,* appellant's interpretation of *Bowen,* Houston simply cannot overcome this elementary constitutional stumbling block.

■ Houston also suggests that HUD does in fact have funds available from sources other than the 1986 appropriation from which it could pay the monies the city seeks. For example, appellant points to approximately $12 million that HUD allegedly

has recouped from other grantees, monies which Houston argues are "no-year" funds that are not reserved for use in any particular year or for particular projects. This argument, however, runs afoul of APA section 702's fundamental requirement that a plaintiff seek relief *"other than money damages."* Section 702 permits monetary awards only when, as in *Bowen,* such an award constitutes *specific relief*—that is, when a court orders a defendant to pay a sum owed out of a specific *res. See generally Hubbard v. EPA,* 982 F.2d 531 (D.C.Cir.1992) (*en banc*) (holding that back pay does not constitute specific relief available under APA section 702). An award of monetary relief from any source of funds other than the 1986 CDBG appropriation would constitute money damages rather than specific relief, and so would not be authorized by APA section 702.

## C. *Availability of Declaratory Relief: Problems of Mootness and Ripeness*

Finally, Houston argues that even if its claim for specific monetary relief is moot (as we hold that it is), it nevertheless is entitled to a declaratory judgment that HUD is required to provide notice and an opportunity for a hearing before reducing a grantee's CDBG.

■ It is well-established that if a plaintiff challenges both a specific agency action and the *policy* that underlies that action, the challenge to the policy is not necessarily mooted merely because the challenge to the particular agency action is moot. *See, e.g., Payne Enters. v. United States,* 837 F.2d 486 (D.C.Cir.1988); *Better Gov't Ass'n v. Department of State,* 780 F.2d 86 (D.C.Cir.1986). This line of cases grows out of decisions such as *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), in which an employer sought declaratory and injunctive relief to prevent New Jersey from granting state welfare benefits to striking workers, on the ground that the state's actions violated federal labor law. In *Super Tire,* the Supreme Court held that because the strike that prompted that suit ended before the case could be resolved, the employer's request for an injunction preventing payment of welfare benefits during the

strike was moot. *See id.* at 121, 94 S.Ct. at 1697. However, the Court observed that the employer's request for declaratory relief was not moot, because its subsequent relations with the union would be affected by the ongoing state policy of providing public assistance to strikers, and because the challenged law was in no way "contingent" or subject to the discretion of an enforcing body, but was "fixed and definite." *Id.* at 122, 124, 94 S.Ct. at 1698, 1699.

 In line with *Super Tire,* this circuit's case law provides that if a plaintiff's specific claim has been mooted, it may nevertheless seek declaratory relief forbidding an agency from imposing a disputed policy in the future, so long as the plaintiff has standing to bring such a forward-looking challenge [6] and the request for declaratory relief is ripe. For example, in *Better Government,* two public interest organizations challenged guidelines used to determine when a person or organization requesting information under the Freedom of Information Act ("FOIA") would be entitled to a waiver of search and copying fees. The appellants in that case filed suit after they were denied a fee waiver, challenging both the specific denials of waivers and the facial validity of the regulations. *See Better Gov't,* 780 F.2d at 89. After the suit commenced, the agencies that had denied appellants' fee requests reversed their denials, mooting appellants' specific claims.

We held, however, that it was evident that the Government intended to continue to apply the challenged standards, and that the appellants' facial challenge to the guidelines alleged a continuing injury due to this practice. *See id.* at 91. Appellants' request for a declaratory judgment that the guidelines were invalid therefore was not moot. We observed that the appellants in that case had standing to challenge the future application of the fee waiver policy, *id.* at 96 n. 53, and noted that the "critical question" was whether, under traditional ripeness principles, the guidelines were sufficiently ripe to permit informed judicial review. *Id.* at 92.

 When a plaintiff's specific claim is moot or otherwise fully resolved, there are three potential outcomes to a request for declaratory relief. First, if a plaintiff has made no challenge to some ongoing underlying policy, but merely attacks an isolated agency action, then the mooting of the specific claim moots any claim for a declaratory judgment that the specific action was unlawful, unless the specific claim fits the exception for cases that are "capable of repetition, yet evading review," *see, e.g., Roe v. Wade,* 410 U.S. 113, 124–25, 93 S.Ct. 705, 707, 35 L.Ed.2d 147 (1973),[7] or falls within the "voluntary cessation" doctrine, *see, e.g., United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953);

---

**6.** As we recognized in *Better Government,* requests for declaratory relief which aim to prevent future illegal acts often will implicate standing concerns. *See Better Gov't,* 780 F.2d at 96 n. 53. Plaintiffs attempting to make out such claims must show that their risk of injury is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992). As the Supreme Court has recognized in several decisions, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Id.* —— U.S. at ——, 112 S.Ct. at 2138 (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)) (brackets and ellipses in *Lujan*); *compare Lyons* (plaintiff who had allegedly been placed in a "choke hold" by police officers lacked standing to seek injunction against future use of that maneuver) *with Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (federal declaratory relief not precluded in case of threat-

ened prosecution under state statute forbidding handbilling).

**7.** For example, in *Flynt v. Weinberger,* 762 F.2d 134 (D.C.Cir.1985), members of the media sought a declaratory judgment that the "press ban" imposed by the Department of Defense during the military invasion of Grenada was unconstitutional. We held in that case that declaratory relief was unavailable because the press ban had been lifted over a year before the case was argued on appeal, thus mooting the issue. The *Flynt* plaintiffs did not allege that there was an ongoing "policy" of excluding the press from military actions, but rather sought a declaratory judgment "solely with respect to the constitutionality of the press ban in Grenada." *Id.* at 135. Accordingly, the entire case was moot, because the sole military action at issue had ended; and there was no reason to expect that a Grenada invasion was "capable of repetition" so as to make the case susceptible to the "capable of repetition, yet evading review" exception to mootness.

*Payne,* 837 F.2d at 491. Second, if a plaintiff challenges an ongoing agency policy by seeking declaratory relief, but lacks standing to attack future applications of that policy, then the mooting of the plaintiff's specific claim obviously leaves the court unable to award relief. Third, as is illustrated by our decisions in *Payne* and *Better Government,* if a plaintiff's allegations go not only to a specific agency action, but to an ongoing policy as well, and the plaintiff has standing to challenge the future implementation of that policy, then declaratory relief may be granted if the claim is ripe for review.

■ The application of the above principles to the instant case is fairly straightforward. Houston's Complaint did nominally seek declaratory and injunctive relief prohibiting HUD from reducing the city's CDBG in the future without notice and a hearing. This litigation, however, has focused almost exclusively on one specific agency action— the $2.6 million reduction in Houston's fiscal 1986 grant. Appellant does not allege that HUD imposed any subsequent penalties without adhering to section 111 of the CDBG Act, or that the agency threatened or even contemplated doing so. Houston did note in its brief to this court that some time after HUD imposed the penalty complained of here, the agency promulgated regulations requiring entitlement cities to make timely disbursements of CDBG funds, as measured by the cities' year-end credit balance ratio, *see* Brief for Appellant at 6 (citing 24 C.F.R. § 570.902 (1993)); but appellant did not directly challenge these regulations either in the trial court or on appeal. Houston also made no attempt to show that the regulations or other HUD policies were affecting its ongoing administration of the city's CDBG program, other than noting in its Reply Brief to this court that HUD's claim to be able to reduce grants without a hearing "continues to affect the temper and tenor of day to day relations between HUD and Houston...." Reply Brief at 4. Appellant has focused almost exclusively on its attempt to recover the 1986 penalty; thus, there is a serious question whether Houston's passing references to HUD's alleged "policy" of acting without a hearing suffice to prevent mooting of its entire case. We need not decide this question however, as even assuming that the city's request for declaratory relief is not moot, it is plain that such a challenge is not ripe for review.

We note that there is no doubt that Houston would have *standing* to challenge an alleged HUD policy of reducing CDBG funds without a hearing. As an entitlement city, appellant receives a yearly CDBG, and so presumably would be at sufficiently imminent risk of injury from such a policy to satisfy standing requirements. *Cf. Payne,* 837 F.2d at 493–94 (plaintiffs were "frequent FOIA requesters" whose "primary conduct" was affected by the practice at issue); *Better Gov't,* 780 F.2d at 93–94 (nonprofit organization plaintiffs "routinely made FOIA requests," and alleged they had a "statutory entitlement" to FOIA fee waivers). However, even if Houston has standing, its claim for declaratory relief is unripe.

■ The framework for assessing ripeness was established in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), in which the Supreme Court provided a two-pronged test that requires a reviewing court to evaluate "both the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration."[8] This court has explained that the "primary focus" of the ripeness doctrine is to balance "the petitioner's interest in prompt consideration of allegedly unlawful agency action against the agency's interest in crystallizing its policy before that policy is subject to review and the court's interest in avoiding unnecessary adjudication and in deciding issues in a con-

---

8. "Ripeness law overlaps at its borders with Article III requirements of case or controversy," *Eagle–Picher Industries v. EPA,* 759 F.2d 905, 915 (D.C.Cir.1985), as some cases may be so unformed as to present no justiciable issue at all. For purposes of this decision, however, we assume that Houston's request for declaratory re-

crete setting." *Eagle–Picher Industries v. EPA,* 759 F.2d 905, 915 (D.C.Cir.1985).[9]

■ Under the "fitness of the issues" prong, the first question for a reviewing court is "whether the disputed claims raise purely legal questions and would, therefore, be presumptively suitable for judicial review." *Better Gov't,* 780 F.2d at 92; *see also Payne,* 837 F.2d at 492; *Eagle–Picher,* 759 F.2d at 915. Next, we consider whether the court or the agency would benefit from postponing review until the policy in question has sufficiently "crystallized" by taking on a more definite form. *Better Gov't,* 780 F.2d at 92. The instant request for declaratory relief utterly fails to meet these standards. The dispute between Houston and HUD concerns the proper characterization of the specific action the agency took in this case— whether the 1986 penalty addressed the city's present or future disbursement of CDBG monies. There is simply no way for this court to consider whether HUD can act without a hearing in some amorphous category of "cases such as this one," because the actual contours of the cases within the category are potentially determinative of their outcome. This case would be quite different if, for example, HUD announced a firm policy, applicable in all cases, under which it claimed the authority to reduce grantees' CDBGs without ever holding a hearing. Here, however, we are presented with a situation in which we require a concrete dispute in order even to know what HUD's policy *is.*

The agency's current regulations provide that CDBG grantees that have an end of year "credit balance ratio" of over 1.5 may be regarded as failing to carry out their activities in a timely manner. 24 C.F.R. § 570.-902(a) (1993). We have no means to evaluate in the abstract the myriad circumstances that might cause a grantee to exceed the target ratio so as to determine whether those circumstances would implicate section 111 of the CDBG Act. Indeed, were the court to

rule on the issue now, "it would be required to conduct a pseudo-rulemaking proceeding" by examining and weighing all of the considerations that might lead the agency to hold or refuse to hold a hearing before reducing Houston's CDBG in the future. *Webb v. Department of Health & Human Servs.,* 696 F.2d 101, 107 (D.C.Cir.1982).

Further, HUD's regulations also allow for agency discretion to impose penalties, providing that HUD "*may* require the [grantee] to undertake appropriate corrective or remedial actions," and if that step fails, HUD "*may* impose a sanction." 24 C.F.R. § 570.900(6), (7) (emphasis added). Thus, "the challenged proscription is discretionary so that it is unclear if, when or how the agency will employ it." *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 940 (D.C.Cir.1986), *vacated on other grounds,* 494 U.S. 1001, 110 S.Ct. 1329, 108 L.Ed.2d 469 (1990). As the Supreme Court observed in assessing an analogous provision: "The regulation serves notice only that the Commissioner *may* under certain circumstances order inspection of certain facilities and data.... At this juncture we have no idea whether or when such an inspection will be ordered and what reasons the Commissioner will give to justify his order." *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 163, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967). Judicial review of this issue "is likely to stand on a much surer footing in the context of a specific application of this regulation than could be the case in the framework of the generalized challenge made here." *Id.* at 164, 87 S.Ct. at 1524.

Finally, under the "hardship" prong, we consider Houston's "interest in immediate review." *Better Gov't,* 780 F.2d at 92. As stated above, appellant noted in passing in its Reply Brief that HUD's alleged policy of violating of CDBG Act section 111 affects the city's ongoing relationship with the agency.

---

lief could satisfy Article III, and consider only the prudential aspects of the ripeness doctrine.

9. Under the ripeness doctrine, the "hardship" prong of the *Abbott Laboratories* test is not an independent requirement divorced from the consideration of the institutional interests of the court and agency. *Payne,* 837 F.2d at 493. Thus, where there are no institutional interests

favoring postponement of review, a petitioner need not satisfy the hardship prong. *See, e.g., Consolidated Rail Corp. v. United States,* 896 F.2d 574, 577 (D.C.Cir.1990). Where, as in this case, there are strong interests militating in favor of postponement, we must weigh the potential hardship of delay on the appellant.

This vague grievance really amounts only to a complaint that this issue remains unresolved. "The only hardship [Houston] will endure as a result of delaying consideration of this issue is the burden of having to file another suit." *Webb*, 696 F.2d at 107. Appellant has not alleged that HUD has reduced its CDBG in an *illegal* fashion since the disputed penalty in 1986, or that the agency has threatened to do so in the foreseeable future. Even if such a threat were imminent, Houston easily could file suit to challenge that action once it occurred.[10] In the event HUD were to impose another penalty, the only harm to Houston if its claim proved meritorious would be the temporary loss of the use of some portion of its CDBG. Given that the penalty at issue here was imposed because appellant had *too much money* in its account and was failing to disburse it rapidly enough, the city can scarcely argue that the temporary loss of some small percentage of its CDBG will cause it "the type of hardship which warrants immediate consideration of an issue presented in abstract form." *Id.*

### III. CONCLUSION

For the foregoing reasons, we hold that appellant's claim for injunctive and monetary relief is moot. We also hold that appellant's claim for declaratory relief is not ripe for review. Accordingly, the judgment of the District Court is vacated and the case is remanded with instructions to dismiss the Complaint.

*So Ordered.*

---

**10.** As we observed in *Webb*, the fact that a claim may not be reviewable in the future is a factor to be weighed in the "hardship" prong of the ripeness test. 696 F.2d at 107 n. 45.