# United States Court of Appeals for the Federal Circuit

---

**SAMISH INDIAN NATION,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

---

2010-5067

---

Appeal from the United States Court of Federal Claims in case no. 02-CV-1383, Judge Margaret M. Sweeney.

---

Decided: September 20, 2011

---

CRAIG J. DORSAY, Dorsay & Easton, LLP, of Portland, Oregon, argued for plaintiff-appellant. With him on the brief were WILLIAM R. PERRY and ANNE D. NOTO, Sonosky, Chambers, Sachse, Endreson & Perry LLP, of Washington, DC.

THEKLA HANSEN-YOUNG, Attorney, Environment and Natural Resources Division, Appellate Section, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were IGNACIA S. MORENO, Assistant Attorney General,

KATHRYN E. KOVACS, Attorney. Of counsel was DEVON LEHMAN MCCUNE, Attorney, United States Department of Justice, of Denver, Colorado.

---

Before BRYSON, GAJARSA[*], and MOORE, *Circuit Judges.*

GAJARSA, *Circuit Judge.*

The issues on appeal before this court are ones of statutory construction. We must decide whether certain claims are premised on money-mandating statutes and are therefore within the jurisdiction of the United States Court of Federal Claims pursuant to the Tucker Act, 28 U.S.C. § 1491(a), and the Indian Tucker Act, 28 U.S.C. § 1505. The Court of Federal Claims dismissed for lack of jurisdiction over the claims brought by the Samish Indian Nation ("Samish") because some of their allegations were not premised upon any statute that was money-mandating, and the allegations reliant on money-mandating statutes were limited by other statutes. We affirm the Court of Federal Claims' decision that it lacked jurisdiction over some of the Samish's allegations because the Tribal Priority Allocation ("TPA") system is not money-mandating. We conclude, however, that the trial court's ability to provide a monetary remedy under the State and Local Fiscal Assistance Act of 1972 ("Revenue Sharing Act") is not limited by operation of the Anti-Deficiency Act, 31 U.S.C. § 1341. We therefore reverse the trial court's dismissal of the Samish's Revenue Sharing Act allegations and remand for further proceedings consistent with this opinion.

---

[*] Judge Gajarsa assumed senior status on July 31, 2011.

BACKGROUND

This case is the latest in a series of suits filed by the Samish to obtain treaty rights and benefits from the United States ("Government").[1]  The Samish's efforts to be federally recognized and acknowledged for statutory benefits are more fully discussed in *Samish Indian Nation v. United States*, 58 Fed. Cl. 114, 115-16 (2003) ("*Samish I*") and *Samish Indian Nation v. United States*, 419 F.3d 1355, 1358-62 (Fed. Cir. 2005) ("*Samish II*") but are briefly summarized below.

---

[1]  In 2002, the Samish filed a complaint under the Administrative Procedure Act ("APA") in the Western District of Washington alleging that the funding the Bureau of Indian Affairs allocated to the Samish after the tribe was officially recognized was inequitable.  *Samish Indian Nation v. U.S. Dep't of Interior*, No. C02-1955P, 2004 WL 3753252, at *1 (W.D. Wash. Sept. 22, 2004).  In 2004, the district court dismissed the Samish's claims for lack of subject matter jurisdiction, for lack of standing, and because there was no "final agency action" allowing for judicial review under the APA.  *Id.* at *3; *see also Samish Indian Nation v. U.S. Dep't of Interior*, No. C02-1955P, 2004 WL 3753251, at *1 (W.D. Wash. Feb. 6, 2004).  The Samish also filed a motion to reopen the 1979 judgment in *United States v. Washington*, 384 F. Supp. 312 (W.D. Wash. 1974), that denied the Samish's claim to fishing rights under the Treaty of Point Elliott.  *United States v. Washington*, 593 F.3d 790, 796-98 (9th Cir. 2010).  The Ninth Circuit sitting en banc held that the recognition obtained by the Samish was not an extraordinary circumstance warranting the reopening of the prior denial of treaty rights.  *Id.* at 798-99.  The Ninth Circuit held that "treaty litigation and recognition proceedings were 'fundamentally different' and had no effect on one another."  *Id.* at 800 (quoting *Greene v. Babbitt*, 64 F.3d 1266, 1270 (9th Cir. 1995)).

Before 1978, the Department of the Interior ("Department") through the Bureau of Indian Affairs ("BIA") accorded tribes federal recognition on an ad hoc basis. *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1272-73 (9th Cir. 2004). In 1966, the BIA created an unofficial list of tribes recognized by the United States. According to the BIA, the 1966 list was not intended "to be a list of federally recognized tribes as such" and was derived from its unofficial files. *Samish II*, 419 F.3d at 1359. The list did not distinguish between tribes based on their treaty recognition status because, at that time, the BIA lacked the legal basis to determine which tribes were treaty recognized. *Id.* The Samish were included on the list.

In 1969, the BIA created another unofficial list restricted to tribes with a "formal organization" approved by the BIA. *Id.* The Samish did not appear on that list due to an arbitrary omission by the BIA. *Greene v. Babbitt*, 943 F. Supp. 1278, 1288 n.13 (W.D. Wash. 1996) (concluding that the omission of the Samish from the unofficial 1969 list was arbitrary). Although the BIA created the list, it lacked the legal authority to determine which tribal groups would be accorded federal recognition. The 1969 list nonetheless became the basis for the BIA's classification of tribes in the future. *Samish II*, 419 F.3d at 1361. According to the BIA employee who prepared the list, the BIA's relevant records from 1969 have been lost. *Id.*

In the early 1970s, Congress began conditioning federal benefits to the tribes and their members on formal federal recognition as determined by the Department. The final regulation establishing the formal procedure for federal recognition of the tribes was published by the Department in 1978. *See* Procedures for Establishing that an American Indian Group Exists as an Indian Tribe, 43 Fed. Reg. 39,361 (Sept. 5, 1978) (codified at 25 C.F.R. Pt. 54 (1979)). As the current version of that regulation

makes clear, federal acknowledgment does "not create immediate access to existing programs." 25 C.F.R. § 83.12(c) (2011). A tribe may participate only "after it meets the specific program requirements, if any, and upon appropriation of funds by Congress." *Id.* Because they were arbitrarily removed from the list of recognized tribes, the Samish ceased receiving federal benefits.

In 1972, the Samish petitioned the Department seeking federal recognition in order to obtain federal program benefits. *Samish Indian Tribe v. Babbitt*, Docket No. Indian 93-1, Office of Hearings and Appeals, Recommended Decision (Dep't of Interior, Aug. 31, 1995). That petition was finally denied fifteen years later by the Department following an informal adjudication procedure. Final Determination That the Samish Indian Tribe Does Not Exist as an Indian Tribe, 52 Fed. Reg. 3,709 (Feb. 5, 1987). As a result, the Samish filed an action in federal district court alleging that the Department's adjudicative procedure violated the tribe's due process rights. In 1992, the district court vacated the Department's determination and remanded the federal recognition petition to be reconsidered under the formal adjudication procedures set forth in the Administrative Procedure Act ("APA"). *Greene v. Lujan*, No. 89-645, 1992 WL 533059, at *9 (W.D. Wash. Feb. 25, 1992), *aff'd sub nom. Greene v. Babbitt*, 64 F.3d 1266 (9th Cir. 1996). This long travail for the Samish finally ended when it obtained federal recognition on April 9, 1996. The Department published formal notice on that date indicating that the Samish was an Indian tribe under applicable federal law. Final Determination for Federal Acknowledgement of the Samish Tribal Organization as an Indian Tribe, 61 Fed. Reg. 15,825 (Apr. 9, 1996).

On October 11, 2002, the Samish filed suit in the Court of Federal Claims seeking money damages under the Tucker Act and the Indian Tucker Act, which waive the sovereign immunity of the United States with respect to certain actions. These statutory provisions only waive the sovereign immunity of the United States. Damages, if any, must be premised on money-mandating statutes. In their first amended complaint, the Samish sought damages for the deprivation of their statutory benefits as a result of the Government's erroneous and arbitrary refusal to recognize the tribe between 1969 and 1996, as well as compensation for benefits that the Samish had been wrongfully denied since their acknowledgement and recognition as a federal tribe in April 1996. *Samish I*, 58 Fed. CI. at 116-17.

The trial court dismissed the complaint holding that the six-year statute of limitations in 28 U.S.C. § 2501 barred all but one of the Samish's claims and 28 U.S.C. § 1500 barred the remaining claim. *Id.* On appeal, this court found that the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450 *et seq.*, and the Snyder Act, 25 U.S.C. §§ 2, 13, were not money-mandating with respect to the Samish's claims. *Samish II*, 419 F.3d at 1358. This court reversed the trial court's determination that the Samish's claim regarding its failure to receive benefits from 1969 until 1996 was time barred. We then remanded "for further proceedings to determine whether the remaining statutes underlying the claim are money-mandating." *Id.*

On remand, the Samish filed a second amended complaint alleging two claims for relief. 2d Am. Compl., *Samish Indian Nation v. United States*, No. 02-1383 (DE 36) at ¶¶ 31-36 (Fed. Cl. Jan. 1, 2006). The first claim sought damages under various federal statutes and programs for the Government's failure to provide the

Samish with benefits from 1969 until 1996. The complaint alleged that either the underlying legal framework of the programs or the statutes creating the programs were money-mandating. 2d Am. Compl. at ¶¶ 31-36; *see Samish Indian Nation v. United States*, No. 02-1383 L, 2006 WL 5629542, at \*1 (Fed. CI. July 21, 2006) (interim discovery order interpreting first claim). The second claim alleged that the "network" of programs and statutes providing federal benefits to all federally-recognized tribes created a fiduciary duty that the Government breached by failing to provide the Samish with benefits. 2d Am. Compl. at ¶¶ 37-44; *see Samish*, 2006 WL 5629542, at \*2 (interpreting second claim).

The Government moved to dismiss the Samish's complaint and argued that the referenced programs or statutes were not money-mandating. Thus, the Samish's claims fell outside the scope of both the Tucker Act and the Indian Tucker Act, and consequently, sovereign immunity was not waived. The Court of Federal Claims issued two opinions explaining why it was granting the motion to dismiss. *See Samish Indian Nation v. United States*, 82 Fed. Cl. 54, 55 (2008) ("*Samish III*"); *Samish Indian Nation v. United States*, 90 Fed. Cl. 122, 128-29 (2009) ("*Samish IV*"). On appeal, the Samish challenge the trial court's dismissal of their claims, but limit their arguments to two programs they allege are money-mandating, the TPA system and the Federal Revenue Sharing program created by the State and Local Fiscal Assistance Act of 1972, Pub. L. No. 92-512, 86 Stat. 919, commonly known as the Revenue Sharing Act of 1972.

In *Samish III*, the Court of Federal Claims held that the TPA system was not money-mandating and, thus, it did not have jurisdiction over either of the Samish's claims. 82 Fed. Cl. at 68-69. The trial court first found

that the TPA system was neither a "statute" nor a "discrete statutory program." *Id.* at 59, 65-66. Rather, it was merely a budgetary mechanism and, therefore, could not impose a money-mandating duty on the Government. *Id.* at 66. The trial court discussed *United States v. Navajo Nation*, 537 U.S. 488 (2003) ("*Navajo I*"), and explained that its analysis "must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Samish* III, 82 Fed. Cl. at 68 (quoting *Navajo I*, 537 U.S. at 507). Applying *White Mountain Apache Tribe v. United States*, 537 U.S. 465 (2003), and *Navajo I*, the trial court next determined that because the TPA system did not create a fiduciary duty on the part of the Government or a specific trust, it could not be interpreted as money-mandating. *Samish III*, 82 Fed. Cl. at 69.

In *Samish IV*, the Court of Federal Claims held that although the Revenue Sharing Act was money-mandating, to the extent that the Samish's allegations in its claim relied upon it, the Anti-Deficiency Act, 31 U.S.C. § 1341, rendered those allegations moot. 90 Fed. Cl. at 133-37. The Court of Federal Claims applied *Agwiak v. United States*, 347 F.3d 1375 (Fed. Cir. 2003), and held that the Revenue Sharing Act's usage of the phrases "is entitled" and "shall pay," made it money-mandating. *Samish IV*, 90 Fed. Cl. at 135-36. The trial court found that the Act was money-mandating because it was framed as an "entitlement" and included the following language: "The Secretary of the United States Department of the Treasury *shall*, for each entitlement period, *pay out* . . . to each State government . . . and . . . each unit of local government a total amount equal to the entitlement of such unit." *Id.* at 133 (quoting 86 Stat. 919 at Sec. 102) (emphasis added). The court analyzed the Samish's claim for statutory damages under the Revenue Sharing Act, but did not address the Samish's breach of trust argu-

ment or whether the Revenue Sharing Act imposed a fiduciary duty upon the Government to provide the Samish with funds authorized by the Act.

The trial court concluded, however, that its ability to award any damages mandated by the Revenue Sharing Act was limited by the Anti-Deficiency Act. *Samish IV*, 90 Fed. Cl. at 136-37. It interpreted the Anti-Deficiency Act as prohibiting a court from "award[ing] funds if an appropriation has lapsed unless an aggrieved party files suit before the appropriation lapses." *Id.* at 136. Because the appropriations for the Revenue Sharing Act lapsed in 1983 but the Samish did not file their lawsuit until 2002, the trial court held that the Samish's allegations related to the Revenue Sharing Act were moot. *Id.* at 136-37. We have jurisdiction over the Samish's timely filed appeal pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

This court reviews the Court of Federal Claims' dismissal of a complaint for lack of jurisdiction and interpretation of statutes without deference. *Brown v. United States*, 86 F.3d 1554, 1559 (Fed. Cir. 1996); *Western Co. of N. Am. v. United States*, 323 F.3d 1024, 1029 (Fed. Cir. 2003). The Government argues that it had no duty to treat the Samish as federally recognized prior to 1996, and therefore, this court need not even address whether the TPA system or Revenue Sharing Act can be interpreted as mandating compensation for damages. This argument is not persuasive because in *Samish II*, this court ruled that the Government's failure to treat the Samish as a federally recognized tribe from 1969 to 1996 was "wrongful" and "arbitrary and capricious." 419 F.3d at 1373-74. The Government's wrongful failure to recognize the Samish gave rise to a damages claim, but two

questions remain. The answer to these questions determines whether the Government is liable to the Samish. The first is whether the Court of Federal Claims has jurisdiction over the Samish's claim because the TPA system is money-mandating. The second is whether the Anti-Deficiency Act limits the trial court's ability to provide a monetary remedy under the Revenue Sharing Act. We address each in turn.

## I.

The analysis of whether a law is money-mandating contains two steps. First, the court determines whether any substantive law imposes specific obligations on the Government. If that condition is met, then the court proceeds to the second inquiry, "whether the relevant source of substantive law can be fairly interpreted as mandating compensation for damages sustained as a result of a breach of the duties the governing law imposes." *United States v. Navajo Nation*, 129 S. Ct. 1547, 1552 (2009) ("*Navajo III*") (quotations omitted). The Court of Federal Claims has jurisdiction if the substantive law at issue is "reasonably amenable to the reading that it mandates a right of recovery in damages." *White Mountain*, 537 U.S. at 473.

Under *Navajo I* and *Navajo III*, the TPA system, Appropriations Acts, and statutes authorizing Indian programs are not money-mandating. The "money-mandating" condition is satisfied when the text of a statute creates an entitlement by leaving the Government with no discretion over the payment of funds. *Doe v. United States*, 100 F.3d 1576, 1581 (Fed. Cir. 1996). In limited situations, the "money-mandating" requirement may also be satisfied if the Government retains discretion over the disbursement of funds but the statute: (1) provides "clear standards for paying" money to recipients; (2)

states the "precise amounts" that must be paid; or (3) as interpreted, compels payment on satisfaction of certain conditions. *Perri v. United States*, 340 F.3d 1337, 1342-43 (Fed. Cir. 2003). As the Supreme Court explained in *Navajo I*, the money-mandating "analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." 537 U.S. at 506. In *Navajo III*, the Supreme Court emphasized that the "text of the Indian Tucker Act makes clear that only claims arising under 'the Constitution, laws or treaties of the United States, or Executive orders of the President' are cognizable." 129 S. Ct. at 1558.

Although the TPA system secures funds for tribes, it is not a statute or regulation.

According to 25 C.F.R. § 46.2, "TPA means the BIA's budget formulation process that allows direct tribal government involvement in the setting of relative priorities for local operating programs." The TPA system refers to the BIA's internal budgeting process, which includes preparation of the BIA's budgetary requests, presentation of the BIA's requests to Congress, and distribution of Congressional appropriations for the operation of Indian programs authorized under different statutes. Congress has enacted authorizing statutes for some but not all of the specific programs covered by the TPA system, including the Johnson-O'Malley Act, the Indian Child Welfare Act of 1978, the Indian Child Protection and Family Violence Protection Act, and the Higher Education Tribal Grant Authorization Act.

In this case, the relevant statutes are the annual Appropriations Acts that provide the TPA system with funds and the statutes creating the programs supported by TPA funds. After receiving the funds through the Appropria-

tions Acts, the BIA allocates the funds among federally recognized tribes if they are participating in statutorily designated programs pursuant to a contract, the Indian Self-Determination and Education Assistance Act, funding compacts, or grant agreements. As the General Accounting Office has recognized, the purpose of the TPA system is to "further Indian self-determination by giving the tribes the opportunity to establish their own priorities and to move funds among programs accordingly, in consultation with BIA." Gen. Accounting Office: Report to Congressional Requesters, GAO/RCED 98-181, at 4(July 1998) (J.A. 230 ¶ 33). The Appropriations Acts do not provide a clear standard for paying money to recognized tribes, state the amounts to be paid to any tribe, or compel payment on satisfaction of certain conditions. *See Perri*, 340 F.3d at 1342-43.

The Appropriations Acts provide funds to the BIA, specifically, "sums . . . appropriated . . . [f]or operation of Indian programs." *See, e.g.*, Appropriations Act for 2001, Pub. L. No. 106-291, 114 Stat. 922 (2000). For example, the Appropriations Act for 1993 states:

Be it enacted . . . [t]hat the following sums are appropriated . . . for the Department of the Interior and related agencies for the fiscal year . . ., and for other purposes, namely: For operation, of Indian programs by direct expenditure, contracts, cooperative agreements, and grants including expenses necessary to provide education and welfare services for Indians either directly or in cooperation with States and other organizations . . .; grants and other assistance to needy Indians; maintenance of law and order; management, development, improvement, and protection of resources and appurtenant facilities under the jurisdiction of the Bureau of Indian Affairs. . .; for

the general administration of the Bureau of In-
dian Affairs. . ., $1,353,899,000.

Pub. L. No. 102-381, 106 Stat. 1374-88 (1992). The an-
nual Appropriations Acts and the statutes that establish
programs supported by TPA funds do not impose any
specific trust obligations on the Government beyond the
general trust relationship that exists between the Gov-
ernment and the tribes.

Since its decision in *Cherokee Nation v. Georgia* in
1831, the Supreme Court has recognized the existence of
a general trust relationship between the Government and
the tribes. 30 U.S. 1, 2 (1831) (explaining the tribes'
"relations to the United States resemble that of a ward to
his guardian"). Similarly, Congress has recognized that
general trust relationship. *See, e.g.*, 25 U.S.C. § 458cc(a)
(noting the "Federal Government's laws and trust rela-
tionship to and responsibility for the Indian people.") As
recently explained in the *United States v. Jicarilla Apache
Nation*, the trust relationship between the tribes and the
Government is "defined and governed by statutes." No.
10-382, 2011 WL 2297786, *8, 564 U.S. ___ (June 13,
2011). In *Jicarilla*, the Supreme Court also explained
that common law trust principles apply to the trust
relationship between the Government and the tribes only
where Congress has indicated it is appropriate to do so.
*Id.* at *11. In *White Mountain*, the Supreme Court distin-
guished instances where the Government undertook "full"
responsibility for managing Indian land and resources
from "limited" trust relations in which the Government
undertook no resource management responsibility. 537
U.S. at 473-74. In *Navajo I*, the Supreme Court looked for
an assignment to the Government of "a comprehensive
managerial role" or express investment with responsibil-
ity to secure "the needs and best interests of the Indian

owner and his heirs" as indicators of a fiduciary relationship. 537 U.S. at 507-08.

In *United States v. Mitchell*, the Supreme Court held that the Government may be obligated to pay damages when a network of statutes describes a fiduciary relationship beyond the general trust relationship between the Government and the tribes. 463 U.S. 206, 226 (1983). The statutes in *Mitchell* imposed "elaborate control" duties on the Government and gave the Government significant managerial responsibility over the tribe's property. The same cannot be said of the TPA system, and although the TPA system facilitates the allotment of federal money to the tribes, it is not money mandating. The network of statutes underlying the TPA system does not contain detailed express language supporting the existence of a fiduciary relationship or a trust corpus. The Samish have not identified any TPA-related statutes containing the level of detail necessary to establish a fiduciary relationship beyond the general trust relationship between the Government and the tribes. *See Jicarilla*, 2011 WL 2297786 at *8; *Navajo I*, 537 U.S. at 507-08. We therefore affirm the trial court's finding that the TPA system is not money-mandating.

## II.

## A.

We now review whether the trial court is correct in its analysis of the other statutes relevant to the Samish's claims, namely, the Federal Revenue Sharing Act and the Anti-Deficiency Act. We affirm the conclusion of the trial court that the Revenue Sharing Act is money-mandating. We hold that the Anti-Deficiency Act does not apply because it does not limit the Court of Federal Claims' power to enter a judgment in damages to compensate a plaintiff for an injury on a claim brought under the

Tucker Act. Therefore, we conclude that the Court of Federal Claims has jurisdiction over the Samish's allegations based on the Revenue Sharing Act.

The Revenue Sharing Act distributed federal funds to state and local governments, including Indian tribes and Alaskan native villages. The funds to be paid to each unit of government were described as "entitlements," and the Act directed that Indian tribes "shall be allocated" a portion of the funds based on population. As discussed below, that language is language that this court has recognized as making a statute money-mandating.

In *Agwiak*, the plaintiff-appellants who had been employed by the Government sought remote worksite pay pursuant to a statute that included language that "the employee in commuting to and from his residence and such worksite, *is entitled*, in addition to pay otherwise due him, to an allowance of not to exceed $10 a day. The allowance *shall be paid* under regulations . . . ." 347 F.3d 1378-79 (quoting 5 U.S.C. § 5942(a) (2000) (emphases different than original)). As the court explained, "[w]e have repeatedly recognized that the use of the word 'shall' generally makes a statute money-mandating." *Id.* at 1380. Similarly, in *Greenlee County, Arizona v. United States*, 487 F.3d 871, 877 (Fed. Cir. 2007), this court held that an act providing that the Government "shall make a payment for each fiscal year to each unit of general local government in which entitlement land is located" was "reasonably amenable" to a reading that it is money-mandating. Additionally, in *Britell v. United States*, 372 F.3d 1370, 1378 (Fed. Cir. 2004), this court held that regulations implementing the military's health insurance plan providing that the plan "will pay" benefits "directly" to the insured, were "reasonably amenable to the reading that [they] mandate[ ] a right of recovery in damages."

Thus, because the Revenue Sharing Act, like the statutes discussed above, directs that tribes "shall be allocated" certain funds, we hold that it is money-mandating.

In *National Association of Counties v. Baker*, 842 F.2d 369 (D.C. Cir. 1988), the D.C. Circuit examined provisions of the Revenue Sharing Act similar to the relevant language in this case and found that the Act did not mandate compensation. In that case, local counties sought to recover revenue sharing funds that had been sequestered pursuant to a statute aimed at eliminating the federal budget deficit. *Id.* at 371-72. The government argued that the counties' lawsuit was one for money damages that fell within the exclusive jurisdiction of the Court of Federal Claims and therefore could not proceed in the district court. The D.C. Circuit disagreed and characterized the lawsuit as a request for the release of specific funds for which the APA waived sovereign immunity, not as a request for money damages. As a predicate to that ruling, the D.C. Circuit determined that the Revenue Sharing Act did not mandate compensation, even though the Act directed the payment of money. *Id.* at 376. We note that the D.C. Circuit reached this conclusion before the Supreme Court's decision in *White Mountain*, 537 U.S. at 472-73 and our decision in *Agwiak*, 347 F.3d at 1378-79, and, as did the Court of Federal Claims, we instead rely on those later authorities in determining that the Revenue Act is money mandating.

## B.

The parties dispute whether the Samish's allegations under the Revenue Sharing Act are barred by the Anti-Deficiency Act or any lapse in appropriated funds. Although the Court of Federal Claims correctly held the Revenue Sharing Act money-mandating, it incorrectly found the Samish's allegations barred by the Anti-

Deficiency Act. *Samish IV*, 90 Fed. Cl. at 133 n.10, 135-37. The Anti-Deficiency Act provides that "[a]n officer or employee of the United States Government . . . may not . . . make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. § 1341(a)(1)(A). The Government argues that the Anti-Deficiency Act "prevents the Court of Federal Claims from granting relief to the Samish because it bars the award of funds pursuant to a statute for which the appropriations have lapsed or have been capped, unless the aggrieved party files suit before the appropriation lapses." Appellee's Br. 49. Because the appropriations for the Revenue Sharing Act lapsed in 1983 and the Samish did not file suit until 2002, the trial court held that the Anti-Deficiency Act barred the Samish's allegations. *Samish IV*, 90 Fed. CI. at 136-37.

The Anti-Deficiency Act limits the authority of federal officials to enter into contracts or otherwise obligate the Government to pay funds in excess of the amounts appropriated. It does not, however, limit the Court of Federal Claims' jurisdiction or its power to enter a judgment in damages to compensate a plaintiff for an injury on a claim brought under the Tucker Act. As explained in *Ferris v. United States*, "[a]n appropriation *per se* merely imposes limitations upon the Government's own agents; it is a definite amount of money entrusted to them for distribution; but its insufficiency does not pay the Government's debts nor cancel its obligations, nor defeat the rights of other parties." 27 Ct. Cl. 542, 546 (1892); *accord Bureau of Land Mgmt.*, 63 Comp. Gen. 308, 312 (Apr. 24, 1984) ("[A] judicial or quasi-judicial judgment or award 'does not involve a deficiency created by an administrative officer' .

. . . Accordingly, such an award would not be viewed as violating the Antideficiency Act." (citations omitted)).

Citing *Star-Glo Associates, LP v. United States*, 414 F.3d 1349 (Fed. Cir. 2005), the Government contends that the appropriations for the program are capped and the funds spent, so, the Anti-Deficiency Act prohibits the judicial award of money over the amount appropriated. In *Star-Glo*, this court found that language in the relevant appropriations act imposed a cap on the available funds and that the imposition of such a cap restricted the government's liability for damages and therefore precluded an award of damages by the Court of Federal Claims. Congress had directed the Secretary of Agriculture to use $58 million dollars in appropriated funds to compensate citrus growers that had lost crop due to disease; such funds were "to remain available until expended." We held that the legislative history of the relevant statute made clear that Congress had intended to limit the Government's liability to the amount specified in the statute and that the Government was therefore not subject to liability for damages. *Id.* at 1352-53. Subsequently, in *Greenlee County*, 487 F.3d at 878-79, we held that explicit language that funds will be "available only as provided in appropriations laws" served to cap the statute and therefore limit the government's liability.

In contrast, neither the text of the Revenue Sharing Act nor its legislative history include the limiting language of the statutes in *Star-Glo* and *Greenlee County*. The Government contends that such language can be found at section 106 of that Act, which states that "if the total amount appropriated under section 105(b)(2) for any entitlement period is not sufficient to pay in full the additional amounts allocable under this subsection for that period, the Secretary shall reduce proportionally the amounts so allocable." But that portion of the Act deals

only with the special provisions for revenue transfer to noncontiguous states. Section 105(b)(2) separately provides for appropriations for such transfers. It is not relevant to the portion of the Act that would have governed disbursement of funds to the Samish, had the Samish been properly recognized as a tribe. We therefore disagree with the government's assertion that the Revenue Act was capped in a manner that restricts the government's liability for damages.

Based on the language of the Revenue Sharing Act and the nature of the Samish's allegations, we reject the government's argument that the Anti-Deficiency Act limits recovery in this case. The Samish do not seek the release of appropriated funds, as in many of the cases involving the APA cited by the Government. Rather, the Samish seek compensation under the Tucker Act for damages for an injury sustained due to the Government's wrongful failure to recognize the Samish and their inability to participate in programs to which they were entitled. The Samish's Second Amended Complaint explicitly seeks compensation for a "harm" done. 2d Am. Compl. at ¶¶ 28-29.

The Court of Federal Claims based its analysis regarding the application of the Anti-Deficiency Act on cases from other circuits, including *City of Houston v. Department of Housing & Urban Development*, 24 F.3d 1421 (D.C. Cir. 1994) and *County of Suffolk, N.Y. v. Sebelius*, 605 F.3d 135 (2d Cir. 2010). Those cases involve a district court's jurisdiction under the APA and are not suits for damages under the Tucker Act. In each case, the plaintiff challenged agency action affecting its funding and sought injunctive relief requiring the agency to restore grant funds. *City of Houston*, 24 F.3d at 1424; *Cnty. of Suffolk*, 605 F.3d at 138-39. The appellate courts

found that the claim became moot when the agency's appropriated funds lapsed or were expended. The courts based their decisions on the limited jurisdiction of district courts in cases brought under the APA. Under that Act, district courts can grant a limited monetary award only if it is in the form of specific relief paid from a particular res. Once the res no longer exists, the claim becomes moot because funds cannot be obtained from any other source. *See City of Houston*, 24 F.3d at 1428; *Cnty. of Suffolk*, 605 F.3d at 140-41. Unlike the district courts, the Court of Federal Claims need not identify a res against which a judgment for declaratory and injunctive relief can be directed. Its judgments are paid from the Permanent Judgment Fund.

The Court of Federal Claims has general jurisdiction to enter judgments in damages against the Government. 28 U.S.C. §§ 1491, 1505. The Permanent Judgment Fund was established to pay monetary damage judgments entered against the Government when other funds are unavailable. 31 U.S.C. § 1304. The relevant section of 31 U.S.C. § 1304 states:

> (a) Necessary amounts are appropriated to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law when—
>
> (1) payment is not otherwise provided for;
>
> (2) payment is certified by the Secretary of the Treasury; and
>
> (3) the judgment, award, or settlement is payable under [various sections of title 28, including § 2517, which includes "every final judgment rendered by the United States Court of Federal Claims."]

Thus, if other funds are not available to pay the judgment, the Permanent Judgment Fund is available for that purpose. *See Thompson v. Cherokee Nation*, 334 F.3d 1075, 1092 (Fed. Cir. 2003) (stating that a claim for damages was not mooted by the lapse in appropriated funds "as damages are awarded from the judgment fund created by 31 U.S.C. § 1304").

As the Government Accountability Office ("GAO") Redbook explains, "unless otherwise provided by law, agency operating appropriations are not available to pay judgments against the United States." United States Government Accountability Office, III Principles of Federal Appropriations Law, at 14-31 (3d ed. 2008). Although the opinion of the GAO is not binding, it is an "expert opinion, which we should prudently consider." *Arctic Slope*, 629 F.3d at 1303; *see also Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (relying on GAO Redbook at 6-159). Because agency operating appropriations are not available to pay the damages due to the Samish, "payment is not otherwise provided for" and the Samish are eligible to receive monetary damages from the Permanent Judgment Fund.

CONCLUSION

We affirm the Court of Federal Claims' decision that it lacked jurisdiction over some of the Samish's allegations because the TPA system is not money-mandating. We also affirm the decision that the Revenue Sharing Act is money-mandating, reverse dismissal of some of the Samish's allegations under the Revenue Sharing Act, and remand to the Court of Federal Claims for further proceedings consistent with this opinion.

**AFFIRMED-IN-PART, REVERSED-IN-PART, REMANDED**